State *v.* Harlow.

THE STATE, Respondent, *vs.* HARLOW, Appellant.

1. The separation of the jury in a murder case held no ground for a new trial, there being no ground to suspect that they had been tampered with.
2. Intoxication is no justification or extenuation of a homicide.

*Appeal from Chariton Circuit Court.*

The facts are stated in the opinion of Judge Ryland.

*Clark,* for appellant. 1. The court erred in giving the 5th instruction for the state. (Wharton's Crim. Law, 395. *Monroe* v. *State,* 5 Geo. 2 Comst. 202.) 2. The 7th instruction was erroneous. (18 Mo. Rep. 423. 8 Smedes & Marsh. 401.) 3. The 3d instruction asked by defendant should have been given. 4. The 4th instruction asked by defendant should have been given. (11 Humph. 154.) 5. The 9th and 18th instructions for defendant should have been given. 6. A new trial should have been granted for the misconduct of the jury. (9 Smedes & Marsh. 465. 13 ib. 398.)

*Gardenhire,* (attorney general,) for the State.

RYLAND, Judge, delivered the opinion of the court.

Kinsolving Harlow was indicted at the May term of the Circuit Court of Chariton county, in the year eighteen hundred and fifty-five, for the murder of Green B. Andrews. He was tried

at the same term and was convicted; the jury finding him guilty of manslaughter in the first degree, and assessing his punishment to ten years' imprisonment in the state penitentiary.

The defendant moved for a new trial; also, in arrest of judgment; which motions being denied, he excepted, and has brought the case here by appeal. His counsel in this court contends that the Circuit Court erred in giving and in refusing to give instructions, and relies principally upon these errors, as alleged by him, for a reversal of the judgment below. He also alleges the separation of a part of the jury from the rest, and the conversing of one of the jurors with a person, not an officer of the court, and without the permission of the court, as a sufficient cause for a new trial, and that the refusal of the lower court to grant a new trial for this cause is error.

In regard to the separation of the jury, it appears that some-time during the trial, while the jury were confined in their room in the hotel, the sheriff went out of the room with two or three of the jurors, a short distance, and stayed a short time, leaving the rest of the jury in the room, with no officer of the court with them; that the sheriff was in sight of the room all the time; that persons might have entered the jury-room and conversed with the jurors, without the sheriff seeing them or hearing them; but the sheriff stated that he believed no such thing was done in this case. The conversation of the juror was in hearing of others; it related to a different matter altogther. It seems that one of the jurors had come to the town where the trial was to take place, in a buggy, with Henry Shrader; that the juror told Shrader not to leave him, to go to the hotel and stay one day longer and he would pay his expenses, by which time he (the juror) thought he would be able to return home with him. This was all the conversation held by the juror.

There is no pretence that the jury were tampered with in this case. In our state, the conveniences for the accommodation of jurors and witnesses, during their attendance at courts, in many of the counties, are very inferior; no court houses in some, and the taverns and public houses are the only places where

rooms can be obtained at all, and these of the most inconvenient kind. Were this court to apply the old strict and rigid rules, in regard to the conduct of jurymen in criminal cases, which have been observed in England and in some of the older states of the Union, it would, in effect, turn loose the guilty upon the community, without a probability of punishment. It would virtually put a stop to the punishment of offences.

The trial of offences should be conducted with the utmost care to avoid all improper influences bearing on the minds of the jurors ; and where such influences have been used, or any tampering with jurors made to appear, the courts should correct such abuses by granting new trials.

The possibility of the use of such influences, or of the tampering, will not alone be sufficient to warrant the granting of new trials ; but wherever facts warrant the belief of any improper interference with the deliberations of the jury, there the new trial should be given. Such has been the doctrine of this court heretofore, and it will still continue. See *State* v. *Igo,* decided at this term. So far, then, as regards the conduct of the juror, in this case, there was nothing which would justify the lower court in granting a new trial ; nor was the bare possibility that, whilst the sheriff was out with two or three of the jurors for a short time, and at a short distance from the jail-room, in the hotel, persons might have entered the jury-room and talked with them about the trial, sufficient ground for the Circuit Court to sustain the motion for a new trial.

In order to determine properly the questions arising upon the giving and the refusing to give the instructions in this case, I have thought it most proper to state the evidence as preserved in the bill of exceptions. Before I do this, let me once more condemn the useless and worse than useless practice of stretching out a few propositions of law, applicable to the case, into a string of instructions, which generally becomes weaker as it grows in length. Here are asked for eight and twenty instructions !—eight for the State, and twenty for the defendant, and, altogether, twenty-one given to the jury. This, in a case in-

State *v.* Harlow.

volving but two or three simple propositions of law, which could be well and plainly laid before the jury in a few pointed, pithy and clear instructions, is condemned as meriting our serious disapprobation. The following is the evidence : The State introduced Daniel J. Hays, who being duly sworn, stated that the last of July, or the 1st of August, some two years ago, as he was coming from Glasgow, when he got to the brink of Chariton river, he saw Green B. Andrews and the defendant in the boat, about to start over the river : he spoke to them, and asked them to wait for him ; that the boat was detained and he rode in the boat, on his horse, by Andrews and defendant, who were standing together, talking : he spoke to them as he passed them in the boat, but neither spoke to him. As soon as he passed them, he got down off his horse and turned around ; as soon as he turned around, he saw a knife, of considerable size for a pocket knife, perfectly new, drawn open in the defendant's right hand. Defendant said to Andrews, "you have a knife ;" Andrews said he did not have one ; defendant reached out his hand and put his finger in Andrews' waistcoat pocket, as witness thought, to feel for a knife. Just at this time, Andrews raised his hands to his side, as if to show he had no knife, when a knife, two or three inches long, slipped from under his sleeve, point foremost, being open ; and as soon as Andrews saw his knife, he turned and ran out off the boat, and defendant was running after him ; and just as Andrews reached the end of the boat at the bank, defendant struck him overhanded, with a knife in his right hand, in the left side of his neck, and Andrews told defendant not to strike him any more. When Andrews started to run out of the boat, he and defendant were nearest the end of the boat he went out at, and he thinks he ran from fifteen to thirty feet before defendant struck him ; that the boat was about thirty or thirty-five feet long ; that, so soon as Andrews was struck and got on the east bank, the boat was shoved off by the defendant, witness and Harlow in it, leaving Andrews and the ferryman on the east bank. The boat landed at the point made by the junction of the east and

west forks of the river, where witness got out, leaving defendant in the boat. At this time, Andrews spoke to witness, to return to him—that he was badly hurt ; but the defendant shoved off the boat and carried it to the west side of the west fork of the river, and then left. Witness saw defendant no more ; that he, witness, immediately went a short distance on the west fork, and got a Mr. Menifee, who was on the west side of west fork, to come down and cross the boat to him, and that witness and Menifee then went to Andrews ; that when they got to Andrews, they found him stabbed in the neck, as above stated, very badly, and seemed to be suffering very much ; that witness remained with him a short time after, and left before he died. He believes the wound was mortal, and that it killed him ; that no one was on the boat, when he first went in it, but Andrews, the defendant, a negro man, (the ferryman,) and himself ; that he was drinking, somewhat intoxicated, but not so drunk but that he could recollect what took place, and remember distinctly that he had his horse in the boat with him, and took him out of the boat when he got out, and that he met no one that evening between the river and home ; that he did not consider a man drunk as long as he could talk and get about ; that Andrews and defendant were both somewhat intoxicated, but not drunk ; that witness had liquor with him and drank after Andrews was struck, and before he finally left Andrews. This killing was done in Chariton county, in the state of Missouri.

The State then called Col. John Moore as a witness, who being duly sworn, stated that the afternoon of the day on which Green B. Andrews was killed, he rode up to the office of one William A. McLure, near Monticello, having heard that two men were down the road, in the direction of Glasgow, about to fight : he looked in that direction and saw two men coming up the road in the direction of where witness was, who proved to be Green B. Andrews and the defendant ; that when the said Green B. Andrews and defendant came up near where witness was, the defendant turned up the Monticello road and rode in

a gallop, and Andrews continued in the road leading to the ferry; that a short time afterwards, the defendant came back from the direction of Monticello and rode up near the witness, when witness (speaking to defendant) said: " Doc., you let Andrews back you out this time. " The defendant replied, " By God, you will see who backed out before we get to the ferry." The defendant started off in a gallop in the direction Andrews had gone. He saw Andrews after he was stabbed. The cut was upon the neck; that when he saw Andrews and Harlow at Monticello, referred to above, they were each drinking, and a little intoxicated, but he did not consider them drunk.

The State then introduced William A. McLure as a witness, who being duly sworn, stated that on the afternoon of the fatal rencounter between Andrews and defendant, he was at his office near Monticello. In looking down the road leading to Glasgow, he saw two men, as he thought, in the act of fighting, near the house of the widow Smith. Fearing that Mrs. Smith might become alarmed at the fighting, he requested Mr. W. V. Hall and James Morrison to go down and try and prevent their fighting at that place. Before Hall and Morrison got very far, he saw them get on their horses, and rode up not far from where witness was standing, when defendant turned up the road leading to Monticello, and Andrews down the road leading to Chariton ferry. The defendant shortly after came back from the direction of Monticello, and on approaching near Col. Moore, Col. Moore remarked to him, (defendant,) " Doc., you let Andrews back you out;" that defendant replied, " By God, you will see before we cross the ferry." He then started off on the road Andrews had gone, in a gallop. He saw Andrews after he was stabbed; he was stabbed in the neck, and believes he died from the effects of the stab, soon after dark of that day. The difficulty occurred when the sun was about two hours high. Defendant and deceased were both drinking; but did not consider either drunk.

The State next introduced W. V. Hall as a witness, who being duly sworn, said that on the afternoon on which the fatal

difficulty occurred, at the request of one McLure, he started down the road leading from Monticello to Glasgow, for the purpose of attempting to keep two men from fighting opposite the house of the widow Smith, on said road. After going a short distance, he found that the two men were Green B. Andrews and the defendant, who had dismounted their horses— the defendant holding a knife in his hand and Andrews a rail in his. After advancing a little further towards the parties, the parties mounted their horses and came up the road leading by McLure's office, at which place Andrews turned down the road leading to the Chariton ferry, and Harlow turned up the road leading to Monticello. A short while after this, the defendant came riding back, in a gallop, and halted as he approached Col. Moore, who was near the office of W. A. McLure. Moore remarked to defendant, "You let Andrews back you out." Defendant remarked, "By God, you will see before we cross the ferry, which backs out;" that he did not remember having told Moore, Harlow had backed out; that Andrews and Harlow were both drinking, but did not consider them drunk.

The State then introduced James Morrison as a witness, who being duly sworn, said, at the request of McLure, he went with Hall to part two men, who seemed to be about to fight opposite the house of the widow Smith, on the road leading to Glasgow. The parties were dismounted; defendant had a knife in his hand, and Andrews had a rail in his; before reaching the parties, they mounted their horses and came riding up together to McLure's office, when defendant turned up to Monticello, and Andrews turned down the hill to the ferry. Don't remember whether witness or any one told Moore, defendant had backed out. After some short time, defendant returned from Monticello, and on approaching Col. Moore, the Col. remarked, "Doc., you let Andrews back you out," or, "you reniged," he did not distinctly know which, but thought it was "reniged;" defendant replied, "By God, you will see, before we get to the ferry," or "to home," he did not remember which, distinctly, and rode off in the direction Andrews had gone.

Thomas Wright was then introduced as a witness, who being sworn, said that he was with Andrews when he died; that he died of the wound on the neck: he saw Daniel J. Hays there; that he considered him as being very drunk; that Hays' horse was on the opposite side of the river from where Andrews was lying; that the wound on Andrews' neck had been sewed up before he got to him; that Andrews died a short time after dark.

The State next introduced C. A. Chapman as a witness, who being sworn, said that as he was returning from home from Glasgow, saw a boy riding very fast for a doctor; he heard there had been a fight, and Andrews was stabbed. I stopped awhile in Monticello and then went to the ferry, where I saw Andrews lying on the bank of the river, and had a wound, as I thought, on the right side of the neck, which had been sewed up. Andrews was then cold and pulseless and weak, and I believe he died of the wound.

The State next introduced Thomas S. Allen as a witness, who stated that the afternoon on which Andrews was killed, he met Andrews on the road leading from Monticello to the ferry, at the foot of the hill, about three quarters of a mile from the ferry, and near Monticello. A short time afterwards, defendant came riding up in a gallop, and, as he rode up, Andrews said to defendant: "Doc., here is the dead come to life," meaning the witness, whom Andrews had heard was dead. The defendant and Andrews were both drinking; the defendant was very drunk—reeling on his horse; the defendant and Andrews rode off together towards the ferry; they seemed friendly. Witness met Edwin Price on the road soon after they passed; witness looked back and saw that defendant had fallen in behind Andrews.

The State then introduced Thomas A. Trent as a witness, who being duly sworn, says that Andrews was at his house the day before the difficulty occurred, and that he asked witness if he thought the defendant would fight; that witness replied he thought defendant would not fight without a knife, but would

fight with a knife; that the deceased said he thought the defendant would not fight even with a knife, and that he intended to try him, knife or no knife; witness again replied, that he (the deceased) had imposed on defendant twice, and that defendant had told witness that the third time he (Andrews) imposed on defendant, would be the charm; and that he (witness) would advise him to let defendant alone. The deceased again replied, he intended to try him again anyhow; that the threats referred to above, as being made by the defendant, " that the third time would be the charm," were made some three years before the fatal rencontre. He further stated that at a Mr. Cross', some three years before the difficulty, he saw deceased press upon defendant, and threatening to strike him; the defendant had a knife in his hand, and was giving back; witness walked up to defendant and took the knife out of his hand; that defendant was giving back; he warned deceased not to press upon him; that if he did, he would cut him. At another time, when defendant, deceased and witness were coming from old Chariton, on the road between old Chariton and home, that deceased again made an effort to fight with defendant, and was pressing on him, and that defendant declined, and walked off briskly from him in a cowardly manner; that the deceased was a much larger and stouter man than defendant; that he considered the deceased an overbearing, quarrelsome man.

This being all the evidence offered by the State, in chief, the defendant then introduced and offered as a witness James Andrews, who being sworn, said he had lived a neighbor to Green B. Andrews, the deceased, during his lifetime, and had known him well for twenty years. Defendant's counsel then asked him what was the general character of the deceased, as a quarrelsome, desperate, overbearing man, or a peaceable man; to the answering of which question the counsel for the State objected, but the court overruled the objection, and the witness answered and said, " that it was not good;" that he had seen him have difficulties with his neighbors, and on one occasion

draw his knife upon an old man ; and that the neighbors, gen-erally, considered the deceased a quarrelsome, overbearing, bad man.

The defendant then introduced Edwin Price, who testified that on the day Andrews was killed, he was at Glasgow with Andrews and defendant ; that in the evening, they all started home ; after they started, the defendant asked Andrews if he thought one Fleming was a stouter man than he was, to which Andrews replied he was ; the defendant said he was not, and that he could whip him or any other man of his age and size. Andrews then told defendant that he himself could whip him ; the defendant denied it ; they then quarreled, and got down off their horses to fight on the road, near where the widow Smith lives. As soon as they got down, Andrews got a rail, and de-fendant drew his knife. In this situation he (witness) left them, and went on the road towards home, meeting no one that he remembers ; that when he got to the Chariton river, he crossed in the boat, and just as he got out of the boat, on the side of the river towards home, defendant and Andrews came up, and defendant halloed to him to wait for him. Witness stopped on the bank of the river ; defendant and Andrews came into the boat ; the defendant sat down on the gunwale of the boat, near the end of the boat farthest in the river. Andrews came up to him and said to him, " you have a knife drawn about you ;" the defendant denied it, and Andrews said, " you are a damned liar, and I will whip you." The defendant sprang to his feet, and then commenced going out of the boat ; the horses were then between the parties and him, so that he could not see much ; but he heard Andrews, after he got on the bank, say, " Don't strike me any more." The witness could not hear every thing that was said ; but could hear very distinctly what he had related, and could see the parties, as stated. Daniel Hays was in the boat at the time, though he was drunk ; he reeled on his horse as he rode in the boat. Witness also stated that defendant and Andrews were both quite drunk ; that he himself was sober, and that he was a brother-in-law of the

defendant's, being a brother of defendant's wife; that as soon as defendant and Andrews got out of the boat, as stated above, he started home; that defendant left; he supposes, ran off, as he never saw him any more until after he was arrested, which was some time last fall; that the river, where Andrews was killed, is about eighty yards wide; that the difficulty occurred in the boat, on the east bank of the river, and that witness was on the west bank at the time of the difficulty.

The defendant then introduced one William Jackson, as a witness, who said he had known the deceased for thirty years; that his character, as a peaceable man, was not good, when drinking; that when under the influence of liquor, he was boisterous and quarrelsome; when sober, the deceased seemed to be a reasonable man.

The defendant then introduced Peyton Windboun, who said that he had lived with Andrews two or three years, and never heard him make any threats against defendant or any body else, and witness never had any difficulty with deceased.

The defendant then introduced Samuel Dewitt as a witness, who said that he had not known deceased very long; that when he was drinking, he was a troublesome and quarrelsome man; when sober, he always thought, a fair man.

This being all the evidence offered by the defendant, the State then recalled John Moore, who stated that the river, at the place where Andrews was killed, was at least a hundred yards wide; that a person could hear loud talking from one bank to the other. This being all the evidence in the case, the court then gave seven instructions for the State, the 5th and 7th of which are complained of by the defendant as erroneous. The 5th instruction is as follows: "No remarks or threats made by Andrews, affecting defendant, to a third party, previous to the assault, and not communicated to defendant, are any justification for the assault or extenuation of the offence." That there is nothing improper in this instruction is too plain for argument. The threats made against a person, by one who is afterwards slain by him, never coming to the ears of the manslayer,

surely were never yet held by a court of justice as any justification or extenuation of the homicide. How can such threats extenuate the act of a man who never was affected by the threats, never having heard them?

The 7th instruction is as follows: " That in every case of the killing of one human being by another, the law presumes malice." This instruction would have been right as a general proposition of law, beyond all question, if the word " unlawful" had been used before the word " killing." As an abstract proposition, the legal mind cannot assent to its correctness as it now stands; but yet we do not consider this general abstract declaration, improper as it is, as authorizing this court to reverse the judgment of the Circuit Court, because we find that the Circuit Court has fairly and properly put the law of this case before the jury, in other instructions, more specific and very favorable for the defendant; indeed more favorably for the defendant than what might be strictly regarded as the law. The instruction No. 17, asked by the defendant, and given by the court, does away with whatever injury the 7th instruction, given for the State, and the refusal to give the 15th, as asked by defendant, might have produced. The 15th instruction is as follows : " Every killing of a human being is not a crime by law." This the court refused to give. It is too general; it has no bearing on the case. It is an abstract, legal proposition, undoubtedly true, more correct than the one in the 7th instruction given; but we think the court properly refused it, even in this case. But, as stated above, the 17th instruction is calculated to do away with any improper impression made by the 7th, given for the State. This 17th instruction declares that, " whilst the law presumes malice when the killing is proved by evidence, yet such presumption is but a general rule of law, and the jury, therefore, in determining the intention, ought to be guided alone by the facts and circumstances of this particular case." So far, then, as the 7th instruction, given for the State, may have had an injurious tendency against the defendant, the same is done away by the 17th and other instruc-

tions given for the defendant. This disposes of every objection made against the judgment below, except the refusal of some instructions asked by defendant. We shall briefly notice them. The court gave fourteen instructions, as prayed by the defendant, and refused to give six, namely, the 3d, 4th, 5th, 9th, 15th, and 18th. The 3d instruction was, in substance, given to the jury in the 6th instruction. The 4th instruction was given in the 8th. There is no cause of complaint in refusing these two, as the same propositions were substantially put before the jury. As to the addition in the 6th, over and above the 3d instruction, it is proper, and was correctly added. The 5th instruction was very properly refused, having no facts in proof to warrant the court in giving it. The 9th instruction is as follows: "That, although drunkenness is no justification for the killing, yet the jury may take it into consideration, in determining the intent with which the defendant did the act." The 18th instruction is upon the same subject, and is as follows : " That, if the jury believe from the evidence before them, that defendant, at the time he killed Andrews, was so much intoxicated as not to be able to act as a sane and rational man ; that he became so intoxicated, not with the intention to kill Andrews, or to do him any personal injury, they must find defendant not guilty." I dismiss these two instructions, by stating that human life, cheap as it now is, would hardly be considered any longer under legal protection, if such should be the law laid down by our courts. It is considered criminal for a man to make himself a drunkard; one crime never yet justified the commission of another. The 15th instruction has already been disposed of. So much for the instructions refused.

The court instructed the jury " that it was not sufficient to justify them, in condemning Harlow, to simply believe he is guilty ; but they must be so thoroughly convinced, by the evidence, that they shall not have a reasonable doubt of his guilt ; that the question of doubt or innocence, in this case, depends entirely, and must be determined alone by the intention which actuated the defendant in the killing ; that, in determining the

motive which prompted the defendant in killing Andrews, they must take into consideration all the facts and circumstances of the case; that, if the jury believe from the evidence, that Andrews manifestly intended to commit a felony upon Harlow, by violence or surprise, at the time of the rencontre, Harlow was not bound to retreat from him, but had a right to pursue him until he was out of danger; and if, in the conflict, Andrews was killed, Harlow would be justifiable, provided such act was necessary to prevent the commission of the apprehended felony or bodily harm."

The defendant has no cause of complaint in respect to the instructions; nor do I think he has against the verdict and punishment assessed by the jury. He has escaped with more leniency than such crimes sometimes meet. In regard to the motion in arrest of judgment, no error is complained of by the appellant here—no objection taken to the indictment.

Upon the whole case, therefore, this court is of the opinion that the judgment below should be affirmed. Let it be so done; the other judges concurring.