## STATE v. WEST, Appellant.

### Division Two, June 26, 1900.

157    309
f157   362
f157   363
157    309
164    531
157    309
177    690

1. **Train Robbery**: INDICTMENT. An indictment for a statutory crime which follows the language of the statute in charging the offense, is sufficient. Form of indictment used in this case considered and approved.

2. ———: INSTRUCTIONS. Where no request is made for further instructions, and no exceptions saved to the failure of the trial court to give them, the defendant can not complain on appeal that the jury was not fully instructed upon all questions of law arising in the case.

3. ———: VOLUNTARY DRUNKENNESS. Under the unbroken line of decisions in this State voluntary drunkenness is no excuse for the commission of crime.

4. ———: DEFENSE: DOCTRINE OF CONSENT. What is known as the "doctrine of consent" is a doctrine relating to the commission of acts which are not criminal except when committed without consent, and because of being so committed. As to such acts consent will in some cases constitute a defense, even where the person committing the act does so with felonious intent and without knowing of the existence of the circumstances which deprive his act of its criminality.

5. ———: ———: ———. But where persons have conspired to commit a crime against the property of another, and the owner of the property when apprised of their design arranges to have the offenders apprehended in the act, he does not thereby consent to their crime, or furnish them with an excuse for committing it.

6. ———: ———: ———: AS EFFECTING PASSENGERS. A railroad superintendent can not consent to the robbery of passengers on a train by others. Any arrangement he may make with such others for the robbery of passengers can not relieve such robbers of the penalty of the statute against train robbery.

Appeal from Pettis Circuit Court.—*Hon. Geo. F. Longan,* Judge.

AFFIRMED.

*H. B. Shain, Jno. D. Dale* and *John Cashman* for appellant.

(1) The trial court committed error in overruling defendant's motion to quash the indictment. 21 Am. and Eng. Ency. of Law, pp. 248, 249; People v. Vice, 21 Cal. 344; 1 Bishop. 426; 2 Wharton, 2705; 1 Wharton, 290, 293; Com. v. Clifford, 8 Cush. (Mass.) 215. (2) The trial court committed error in not instructing on the whole case. State v. Taylor, 118 Mo. 153; State v. Lake, 107 Mo. 147. (a) In not instructing on what facts if proven established criminal intent. State v. Johnson, 111 Mo. 578. (b) In not instructing on intoxication as affecting intent. Roberts v. People, 19 Mich. 401; People v. Eastman, 14 N. Y. 562; People v. Walker, 38 Mich. 156. (3) The trial court committed error in not giving instructions on the question of consent as a defense. 2 Archbald Cr. Pr. and Pl., p. 1181; 2 Russell on Crimes, p. 190; 3 Chitty on Crim. Law, p. 914; 1 Wharton's Crim. Law, p. 751; Ibid., 1262, 1540, 1802, 306 and 392; Com. v. Hollister, 157 Pa. 13, more fully reported in 25 Lawyer's Reports annotated, p. 349; Saunders v. People, 38 Mich. 218; Conner et al. v. People, 18 Col. 373; People v. Murphy, 93 Mich. 41; Pigg v. State, 43

Tex. 198; O'Brion v. State, 6 Tex. App. 665; People v. Mc-Cord, 76 Mich. 200; People v. Clough, 59 Cal. 438; Allen v. State, 40 Ala. 334; Reg. v. Johnson, Cor. & M. 218; Kemp v. State, 11 Humph. 320; State v. Chambers, 6 Ala. 855; State v. Adams, 115 N. C. 775; Zink v. People, 77 N. Y. 114; U. S. v. Whittier, 5 Dill. 35; State v. Duncan, 8 Rob. (La.) 1562.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) No error was committed by the trial court in overruling defendant's motion to quash the indictment. The indictment in this case was based upon the provisions of the act of 1895 (Laws 1895, p. 160), in relation to the crime of train robbing. It is only necessary that the indictment shall contain enough to notify the defendant of the crime charged and follow the language of the statute as near as may be. State v. Clinton, 67 Mo. 380. In the case of forgery the intent to defraud may be charged generally without charging an intent to cheat and defraud any particular person. State v. Phillips, 78 Mo. 49; State v. Yerger, 86 Mo. 33; State v. Rucker, 93 Mo. 88; State v. Jackson, 89 Mo. 561; State v. Flora, 109 Mo. 293; State v. Warren, 109 Mo. 430; State v. Rowlen, 114 Mo. 629. (2) Objection is also made that the court should have instructed upon the question of intoxication as affecting intent. It is insisted by him that he was intoxicated at the time the act of stopping the train was committed, and in no condition to form an intent to commit the crime of robbery. Authorities unanimously concur upon the proposition, that voluntary intoxication or drunkenness at the time the criminal act is committed constitutes no defense or excuse therefor. State v. Harlow, 21 Mo. 446; State v. Dearing, 65 Mo. 530; State v. Eddings, 71 Mo. 545; State v. Ramsey, 82 Mo. 131. It has sometimes been said by courts that intoxication instead of being an excuse for

crime should be considered as an aggravation of the same. 4 Blackstone's Com., sec. 25; State v. Smith, 49 Conn. 376; State v. Beck, 76 Ga. 453; 2 Greenleaf on Evidence, sec. 374; People v. Upton, 109 Ill. 169. (3) "If a man suspects that an offense is to be committed and instead of taking precautions against it, sets a watch and detects and arrests the offender, he does not thereby consent to their conduct or furnish them any excuse. And it is not ordinarily otherwise, though the watching is accompanied by artifice." Bishop's Crim. Law, sec. 262; Wharton's Crim. Law, sec. 149; Thompson v. State, 81 Am. Dec. 364. The authorities on this subject, so far as we have been able to observe, seem to hold that so long as the prosecutor did not induce the original intent, and only provided for its execution after the intent was formed, the criminality of the defendant will not be questioned. State v. Covington, 2 Bail. 569; State v. Alexander, 12 Tex. 540.

GANTT, P. J.—The defendant with Eli J. Stubblefield was indicted at the February term, 1899, of the Pettis Circuit Court. He was duly arraigned and pleaded "not guilty." A severance was granted and each tried separately. Defendant was convicted and sentenced to the penitentiary for ten years. He appeals.

The indictment sought to charge an offense under the act of April 2, 1895 (Laws of Missouri, 1895, p. 160), entitled "An Act in relation to the crime of train robbing and to provide a penalty therefor."

The indictment is in these words:

"In the circuit court of Pettis county, Missouri, April term, 1899.

"State of Missouri, county of Pettis, ss.

"The grand jurors for the State of Missouri, duly impaneled, sworn and charged to inquire within and for the body of the county of Pettis and State aforesaid, upon their

oath present and charge that heretofore, to-wit, on the twenty-ninth day of November, 1898, at the county of Pettis and State of Missouri, James L. West and Eli J. Stubblefield, unlawfully and feloniously did stop, detain and arrest the progress of a certain railway passenger and express train, the property of the Missouri Pacific Railway Company, a corporation duly organized and existing under the laws of the State of Missouri, by then and there giving to the engineer of said train a danger signal by swinging a lighted lantern across the track of said railway in front of said train, which said railway train was then and there upon and moving along the railroad track and railway of the said Missouri Pacific Railway Company within said county of Pettis and State of Missouri, with the felonious intent then and there to commit robbery thereon, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State."

The evidence tended to prove the following facts:   The Missouri Pacific Railway Company is a railroad corporation duly organized under the laws of Missouri, and on the 29th day of November, 1898, and for a long time prior thereto and ever since owned and operated a railroad from Sedalia, in Pettis county, to Kansas City, in Jackson county, known as the Lexington branch of the Missouri Pacific Railway and ran its trains over said branch.   Georgetown, Hughesville and Houstonia are stations on said railroad in Pettis county.

On the night of November 29, 1898, the regular passenger train from Kansas City to Sedalia was stopped a short distance east of Hughesville, in Pettis county, by a danger signal, the waving of a white light across the railroad track. The lantern was waved by a masked man who held the lantern in one hand and a revolver in the other.   The division superintendent, Mr. Hopkins, had been apprised that an attempt to rob the train would occur that night and in pursu-

ance of this information had caused a guard to be placed on the train. When the danger signal was displayed the engineer of the train responded with two short blasts and immediately shut off the steam and applied the air to the brakes and stopped the train. As the engine approached, the man who was waving the lantern sprang to the left side of the track. One of the guards shot at him and he shot at the guards on the engine cab almost simultaneously.

As soon as the train stopped, the guards jumped off and pursued the parties who stopped the train. The defendant West was arrested in the adjoining field.

Thomas Furlong, who was in charge of the detectives, testified that he saw a man standing upon the bank of the cut above the place where the man waved the lantern was standing, and this man also was shooting at the train. This man ran across the field and the guards followed and arrested him. He identified the prisoner as James West, the defendant. When arrested he had two handkerchiefs around his neck, a sack in his overcoat pocket and was armed with a revolver and had a number of cartridges. The prisoner was brought to the train by the guards and laid on the floor of the baggage car, and was identified by Barnett, one of the guards. While lying there he was approached by Furlong and asked if he knew him. The prisoner answered, "You are DeLong aren't you?" and then said "How did I get here?" He was brought to Sedalia on the train. Having heard that the defendant was feigning drunkenness, Mr. Hopkins and Mr. Manley went to the prisoner and bent over him, close to his face to ascertain if he had been drinking, but they could discover no smell of liquor on him.

The other robber escaped from the scene of the "hold up," but about half past twelve o'clock that night was arrested by the officers in Sedalia and proved to be Stubblefield. He was wounded in the right elbow and his clothing was shot. He was disguised.

E. H. Adams testified that he had lived in Sedalia for 17 years. Had been employed by the Missouri Pacific Railway as fireman and engineer for 15 and 16 years, but at the time of the "hold up" was not working for the company but had an office in Sedalia. West and Stubblefield were both old employees of the Missouri Pacific. West the defendant, had been employed as engineer for 8 or 10 years. Sometime in the latter part of June or first of July, 1898, he came to the office of witness Adams and said he was in need of money and intended to hold up a Missouri Pacific train on the Lexington branch. He said he had men who would help him—Eli Stubblefield, Joseph West and Robert Cunningham. Later on Joe West was at a conference and Stubblefield was there on two different occasions. In the latter part of October, West, the defendant, and Stubblefield were in witness's office over Bank of Commerce building in Sedalia and they then said they had made their arrangement and were going to rob that train. They finally agreed to do it on the night of November 25th. The arrangement was that James West, Stubblefield, Cunningham and Joe West were to meet witness Adams at the Grand avenue and Main street crossing and ride out to the place for stopping the train in Adams's surrey. Adams was to take them out and come back. After robbing the train they were to cut the engine off and ride back to Sedalia on that.

For some reason the first appointment for the 25th failed and they then set the 29th of November as the time. The object in riding out was to avoid being trailed by blood hounds. They agreed they would rob train No. 194 on Lexington branch. This train was due in Sedalia at 10:05 p. m. They agreed they would stop the train, compel the engineer and fireman to go with them into the express car and make the messenger open his safe and if he didn't they would kill him. The defendant said to witness the reason they

could not go the first night was that Cunningham's child was very sick but the train would be held up on Tuesday the 29th of November. Witness was to meet them at 7:30 at Grand avenue and take them out to Georgetown. At that hour he went in his surrey and met the defendant and Stubblefield at the Grand avenue crossing. They had a lantern, mask, revolvers and sack. Witness drove them in a surrey to a point 150 yards from the railroad crossing west of Georgetown, and let them out and then drove home. The spoils were to be divided between Adams, Stubblefield and West, the defendant. This witness identified the handkerchiefs which were found on defendant and the lantern and sacks.

Grimshaw, the express messenger, testified to seeing the lantern waved. He heard the shots at the engine and saw a man on the bank opposite his car. The moon was shining and he saw this man run across the field, and fall down and called to the guards and they pursued him and arrested him and brought him back to the train. He recognized the defendant as the man the guards brought back to the train, and who was identified that night as Jim West. Other witnesses corroborated these witnesses as to the stopping of the train and the identification of the prisoner and his clothing.

Various errors are assigned for a reversal of the judgment and they will be considered. ·

I. It is insisted that the indictment is insufficient in that it fails to set out what the defendant intended to do and does not charge defendant with intent to take by force or against the will and without the consent the property of some person other than defendant and does not charge the offense with sufficient particularity.

This is a statutory crime and by reference to the act it will be seen that it is made a felony for "any person in any way.....to stop, detain, or arrest the progress of any train, car, engine, tender or coach with the intent to commit rob-

bery thereon." [Laws 1895, p. 160.]  The statute itself individuates the elements of the crime and when this is so it is sufficient to charge the offense in the language of the statute.  In this case the indictment states every fact descriptive of the offense as defined in the statute and is sufficient.  [State v. Batson, 31 Mo. 343; State v. Addcock, 65 Mo. 590; State v. Van Wye, 136 Mo. 227.]

But the indictment is good according to the analogies of criminal pleading.  The offense under the statute is not robbery but stopping a train with intent to commit robbery thereon.  It may be likened to a charge of forgery with intent to defraud.  In such a case it is not necessary to charge an intent to defraud a particular person.  So here the offense denounced by the statute is made out by proof that the defendant feloniously stopped the train with intent to rob and it is not necessary to allege the intent to rob a particular person or corporation, nor to charge a robbery in fact. [State v. Phillips, 78 Mo. 49; State v. Yerger, 86 Mo. 33; State v. Flora, 109 Mo. 293; State v. Rowlen, 114 Mo. 626.]

II.  It is urged that the court committed error in not instructing upon all questions of law arising in the case.

The instructions given and refused will be considered but it is sufficient on the point now under consideration to say that outside of the special requests prayed by defendant no request was made for other instructions and no exception saved to a refusal to instruct on all questions of law.  [State v. Cantlin, 118 Mo. loc. cit. 111.]  Under this head it is insisted that the court should have informed the jury what facts would have established criminal intent.  The only intent required in connection with the stopping of the train was an intent to commit robbery thereon, and this the court told the jury.  To have commented on the facts showing this intent would have been error.  It was the province of the

jury to find the intent or want of such intent from the facts and circumstances in evidence.    This point is not well taken.

Under this same general assignment error is predicated on a failure to instruct on intoxication as affecting intent. The court of its own motion gave the following instructions:

"3.  The court instructs the jury that drunkenness, in any degree, can not justify, excuse or mitigate the commission of a crime, and if the jury believe from the evidence that the defendant did, with one Eli J. Stubblefield, stop, detain and arrest the progress of the Lexington branch train on the Missouri Pacific railroad as described and defined in instruction number one, on behalf of the State, with intent to commit robbery thereon, they should find the defendant, James L. West, guilty; and the fact that defendant may have been drunk to any degree at the time can not be taken into consideration by the jury in making up their verdict.

"4.  The court instructs the jury that in making up their verdict, they will entirely disregard all the testimony with reference to the defendant being drunk, and that drunkenness can not be pleaded in excuse, mitigation or defense of any crime."

The unbroken line of decisions in this State is that voluntary intoxication at the time the criminal act is committed constitutes no excuse therefor.    [State v. Harlow, 21 Mo. 446; State v. Dearing, 65 Mo. 530; State v. Ramsey, 82 Mo. 133; State v. Duestrow, 137 Mo. 44; State v. Kindred, 148 Mo. loc. cit. 286.]    There was no error in giving these instructions or refusing instruction numbered 23 prayed by defendant, as it is apparent the latter referred to defendant's condition as one of intoxication.

III.    There is no merit in the objection to the first instruction that it assumes a white light is a danger signal.    It was distinctly left to the jury to say whether it was a danger signal.

State v. West.

IV. The most important question arising on this record is what is denominated the doctrine of consent as a defense. Is the case at bar one in which this doctrine can be utilized as a defense? The doctrine may be epitomized thus: Private persons can not license crime and it is no excuse that the evil-doer has any one's consent thereto, but to this general principle there are exceptions.

"There are acts which the law makes criminal when, and because done without consent, the doing of which with consent is not criminal." [1 Bishop's New Crim. Law, sec. 258.] It depends on the character of each particular offense whether or not it exists when the act is consented to.

A man may give away his property; therefore, another who takes it by his permission does not commit larceny. So likewise as robbery is a compound larceny, that is to say, a larceny committed by violence or putting in fear, it falls within the category of those acts which if done with the consent of the owner of the property is not legally criminal.

The contention of counsel for defendant in this case is three fold: First, that the train on the Missouri Pacific on the night of November 29, 1898, was not stopped by means of the danger signal with the felonious purpose of committing robbery thereon, but was stopped by the pre-arrangement of the trainmen for the purpose of apprehending defendant and his associates at the suggestion of the superintendent of the railroad; second, that the train was stopped by a signal given by a party other than this defendant and that party was one taken to the scene at the suggestion of and under an understanding with the superintendent whose acts in that behalf can not be imputed to defendant; third, that although the signal given to stop the train was a danger signal and was the means of stopping the train, and the act of a party whose acts are imputed to this defendant, still the conduct of the superintendent of the railroad took away

the criminal quality of the act and no crime has been committed.

First. Recurring now to the first of these propositions, was the train waylaid and stopped at the suggestion of the superintendent or was it brought about by the independent action of the defendant and his associate Stubblefield? The jury were required to find and by their verdict found that the train was in fact stopped by the danger signal given by Stubblefield in furtherance of a conspiracy entered into between Stubblefield and defendant, who was present, armed and prepared to assist in robbing said train. Counsel for defendant base their insistence upon the assertion, that the superintendent "suggested" to the witness Adams that he accompany defendant and his co-defendant to the place of robbery. This is a question of fact. Mr. Hopkins, the superintendent, testified that Adams approached him, telling him that the arrangement had been made by which the robbery was to be effected, and that it had already been agreed that Adams should take the defendant and his co-defendant from Sedalia to the appointed place on the day selected; that this information came unsolicited by the superintendent, and to this Mr. Hopkins merely assented that he supposed it would be all right for him (Adams) to do as he had agreed. Taking the evidence altogether we are unable to find any agreement by the company that the crime should be committed. On the contrary the evidence is ample that as soon as the information was imparted Mr. Hopkins at once took steps to prevent the contemplated robbery. He did nothing to aid in the crime. He merely took steps to prevent the robbery and apprehend the would-be robbers. No special train was sent out to be robbed. The regular train on the regular schedule time was sent out as usual, but protected by guards to prevent the consummation of the conspiracy.

He did this without the knowledge of defendants and they acted entirely on their own responsibility.

The attempt to show that the engineer did not act upon his printed instructions to stop his train when confronted with a danger signal was negatived by the engineer who swore he stopped his train on his own responsibility at the appearance of the signal and not at the suggestion of Furlong, the detective, and in this he was fully corroborated by Furlong, who testified he had no authority over the engineer and that the latter had already shut off the steam, answered the signal and applied the air to the brakes before Furlong asked him to stop to let him off.

It must be held in view of the verdict that the train was stopped by the danger signal, and not by Furlong, and that the signal was given by Stubblefield. The mere fact that the train in stopping passed the man who gave the signal a few yards, does not contradict the main fact that it was stopped by the signal, and there is no evidence that the engineer stopped the train under the direction of Mr. Hopkins, or at his suggestion.

Second. As to the proposition that the train was stopped by some person other than Stubblefield who was clearly shown to be a co-conspirator with defendant, there is no proof whatever. The utterly incredible story of the defendant does not support the theory that it was Adams who gave the signal. According to defendant he was so stupefied that he did not know how he came to the scene of the robbery, and had abandoned the enterprise, and had left before the train was stopped, hence even if credited he does not place the giving of the signal on Adams.

Third. We are thus brought to the third and last proposition, to-wit, conceding the train was stopped by the danger signal and that signal was given by his co-conspirator,

Vol. 157 mo—

still as it was done by the consent of Hopkins, the superintendent, no crime was committed. This doctrine was asserted in instructions numbered 14, 16, 17, 18, 21, 24 and 26, asked by defendant and refused by the court.

The rule invoked by defendant is expressed by Bishop in the 5th edition of his work on Criminal Law. Section 262, as follows: "The cases of greatest difficulty are those in which one suspecting crime in another, lays a plan to entrap him; consequently, even if there is a consent it is not within the knowledge of him who does the act. Here we see from principles already discussed, that, supposing the consent really to exist and the case to be one in which on general doctrines the consent will not take away the criminal quality of the act, there is no legal crime committed, though the doers of the act did not know of the existence of the circumstances which prevented the criminal quality attaching." [2 Archbold's Crim. Pr. & Pl., p. 1181; 2 Russell on Crimes, p. 190; 3 Chitty Crim. Law, p. 925; 1 Whart. Crim. Law (10 Ed.), sec. 914.] This doctrine is well illustrated by the decisions of the courts. Thus it was held in Connor v. People, 18 Col. 373, that the crime of larceny is not committed when the property is taken with the consent of the owner, even though such consent was given for the purpose of entrapping the person suspected, and the doer of the act did not know of the existence of the circumstances which prevented the criminal quality attaching. In that case the detectives in their zeal or under a mistaken sense of duty, suggested and instigated the commission of the crime in order to arrest the offender in the act, and it was justly rebuked by the court, and to the same effect is Saunders v. People, 38 Mich. 218.

But on the other hand it is equally well-settled law that where two or more persons conspire to commit an offense, and the person against whom or whose property the offense

is premeditated becomes apprised of their intention and arranges to have them apprehended in the act, he does not thereby consent to their conduct, or furnish them any excuse.

In Thompson v. State, 18 Indiana 386 (81 Amer. Dec. 364) the evidence showed that the owner and clerk of a store into which the defendants entered, were apprised of the intended crime by one Frost who was pretending to act with them as a confederate. Armed men were placed inside. The defendants entered the store through an outside window and inner door that were opened by them. They were arrested in the store. The proprietor was close at hand waiting for their entrance. The evidence conflicted. Frost stated that Thompson did the breaking; French, that Frost did it. The court was asked to instruct "that if the breaking and entering the house was done with the knowledge, procurement, and consent of the owner, you ought to find defendant not guilty," which it refused. The ruling was affirmed, the Supreme Court saying: "In the cases at bar, there is nothing showing that the owner of the property consented to the commission of the crime, unless his remaining passive, so far as their contemplated proceedings were concerned, and failing to take any measures to prevent the breaking and entering, should receive that construction. The witness, Frost, was not his servant; he made no agreement with him by which he was to bring the defendants there. He simply arranged, and let Frost know that he had done so, for the arrest of the men, 'if they did break into and rob the store.' He did not furnish the means by which they might enter. Their entrance was by breaking. There was, therefore, no evidence tending to prove that the breaking and entering were by the procurement of the owner; and for that reason, the instruction asked was rightfully refused."

In this case not only did the superintendent make no agreement that his train should be robbed, but he did not

remain passive. As soon as the robbers began their work, armed guards opened fire on them. It is apparent, we think, that Adams was not the agent of the railroad company. He was a mere informer, so far as the company was concerned, and however much we may condemn his character, the company had a perfect right to avail itself of the information he gave without being responsible for his acts. We are clear that the facts of this case show that Mr. Hopkins, the superintendent, did not originate the scheme to rob the train; that he did not suggest the commission of the crime, either personally, or by his agent or servant, and the facts of this case wholly fail to bring it within the rule of law so earnestly pressed on our attention by the learned counsel for defendant.

But there is another view presented by the Attorney-General. The act under which this prosecution is maintained, was enacted, not alone for the railroad company whose trains might be stopped, but it was for the protection as well of the passengers thereon, their lives and property. As to them it can certainly be said that the superintendent of the company could not consent to their being robbed. It was not in his power to deprive them of the protection of this statute. No error was committed in refusing the instructions to which we have already referred by number.

V. The defendant asked thirty-six instructions. The court gave him twelve, and refused twenty-four. The practice of offering such a mass of instructions is very reprehensible. The issues in this case were exceedingly simple, and the proposition urged by counsel could have been stated in a very small compass. Outside of the stereotyped instructions as to reasonable doubt, good character, the credibility of witnesses, and the presumption of innocence, four instructions would have covered every principle of law arising in the case.

Among others, the court gave the following for defendant:

"11.  The court instructs the jury that to flag and stop a train is not in itself unlawful unless coupled by evidence of an intent to commit the specific crime charged in the indictment.

"12.  The court instructs the jury that if they believe from the evidence that after arriving at the scene of the alleged intended robbery, the defendant refused to participate in said alleged intended robbery, and so told witness E. H. Adams in the presence of the two masked men, and said to them to put out the light, and said defendant did abandon said alleged intended robbery and the right of way of said railway company, before any act was done calculated to stop, detain or arrest the progress of said railway passenger and express train, as alleged in the indictment, and did not participate in the stopping, detaining and arresting the progress of said railway train, as alleged in the indictment, then their verdict will be not guilty."

We have read all the instructions asked by defendant and discover no error in the action of the court in refusing those not given.   Indeed we think the court was far too lenient in repeating the same principle over and over at the request of defendant.

We have neither the time nor inclination to enter upon a critical discussion of each of the refused instructions. Those given for the State and defendant fully covered every issue before the jury, and it was no error to refuse others even if they contained some correct statement of the law abstractly considered.

We have carefully gone through the record as to the other assignments and find no reversible error in any of them.

Upon the whole, the case was well tried and the jury having found the defendant guilty upon evidence amply sufficient to support their verdict, the judgment must be and is affirmed. *Sherwood* and *Burgess, JJ.,* concur.