**STATE of Missouri, Respondent,**

v.

**Samuel Levi ERWIN, Appellant.**

**No. 74887.**

Supreme Court of Missouri,
En Banc.

Feb. 23, 1993.

As Modified on Denial of Rehearing
March 23, 1993.

Patrick J. Berrigan, Asst. Public Defender, David S. Durbin, Appellate Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Millie Aulbur, Asst. Attys. Gen., Jefferson City, for respondent.

HOLSTEIN, Judge.

Defendant was charged with first degree murder, § 565.020,[1] but was convicted upon jury trial of second degree murder, § 565.-021, and sentenced to life imprisonment. In addition, he was charged and convicted of armed criminal action, § 571.015, with a sentence of fifty years' imprisonment. The sentences were to be served consecutively. Following opinion, the case was trans-

ferred to this Court. *Mo. Const. art. V, § 10.* The issue motivating transfer is whether defendant's due process rights are violated because he could not rely on intoxication as a defense and because the approved instruction on intoxication relieves the state of its burden of proof as to the accused's mental state. While we adhere to the rule that voluntary intoxication is not a defense, the judgment is reversed.

## FACTS

Defendant Levi Erwin killed Aaron Cochran with a shotgun blast to the head as Aaron lay sleeping on his bed at 3:30 or 4:00 o'clock on a Saturday morning, August 20, 1988. Aaron was 17 years old. Levi, also 17, was an overnight guest in Aaron's house. The evidence shows nothing of any motive for the killing. Levi and Aaron were friends. Levi said, in a later videotaped statement made to sheriff's deputies, "[W]e were just like brothers."

The only account of the events surrounding the killing comes from Levi's own statements to the sheriff's deputies, made later in the day of the killing and on the day following. A videotape of his statement made to the officers on the second day after the killing was shown to the jury at the trial, and the jury members were furnished with transcripts thereof.

Aaron lived with his parents and two brothers in their rural home. The parents and the brothers were absent from home on this night, and Levi's overnight stay was prearranged between himself and Aaron. The two youths were not together during Friday evening, but each was engaged in other activities with other friends. Levi was driven by a friend to the Cochran house and dropped off there at about 12:35 a.m. Aaron had not yet arrived home. He got home about 1:00 a.m.

Aaron had brought home with him a small keg of "Matilda Bay," which the evidence describes as a wine cooler, and a six-pack of beer. After Aaron got home, the two boys watched "The Three Stooges" on television, then watched a videotaped Viet-

1. All references to statutes are to RSMo 1986, unless specified otherwise.

nam movie, "Purple Hearts." Levi later told the police officers that the movie excited him. Both Levi and Aaron were involved in a paramilitary group called "Atherton Defense Group."

Aaron and Levi drank the Matilda Bay and five cans of the beer—the sixth had been broken—as they watched the movie. Levi himself drank three glasses of Matilda Bay, but he did not say how much beer. At about 3:15 a.m., Aaron went upstairs to bed. He had difficulty climbing the stairs. After his death, his blood alcohol content was found to be .05 percent. One tenth of one percent (.10 percent) blood alcohol content would indicate intoxication.

After Aaron had gone to bed, Levi went to the basement of the house to get a gun to take with him on a nocturnal quadrunner ride "because I thought maybe I would see a wolf or something out there." In the basement he shot off some rounds with a 12–gauge pump action shotgun. (The sheriff's deputies, when they came to the house later, found the walls and the ceiling of the basement had been shot into. The water pipes in the basement had been damaged by shot so that the basement was flooded.) Levi then apparently took the shotgun upstairs and shot Aaron, who was asleep on his bed. From the massive head wound and other evidence, witnesses concluded there was a second shot. In his later statement Levi said, "I don't really know, but I'm not saying it for a fact, but I can picture myself shooting Aaron in his room." Asked if he considered this person that was lying on the bed to be Aaron, he answered, "No. I never thought about it until afterwards." He estimated the time of the shooting at 3:30 or 4:00 o'clock in the morning.

Levi, after the shooting, dropped the shotgun and ran outside. He drove across a plowed field in a station wagon and got the station wagon stuck. He returned to the Cochran house and fell asleep in the cab of a grain truck. When he awakened in the morning, he vaguely remembered shooting in the basement. He went into the house. He went upstairs and realized he had shot Aaron. He got the shotgun from Aaron's room. He returned a second time to Aaron's room. "I remember looking at Aaron's body again to hope that it was a nightmare or something, and it wasn't."

Levi attempted to call his parents but found the phone was dead. Officers later discovered the phone wire had been severed by one of the shotgun blasts in the basement of the house. He walked to the nearby house of one Carl Martin. There was no one home. He took a truck and drove to his own home in Independence, a distance, we surmise, of 10 or 12 miles, where he lived with his mother and father. He gave his mother and father a confused and hysterical account of the events described above. The father called the sheriff's office. Sheriff's deputies repaired to the Cochran house. There they found the gruesome scene, which can be imagined from what had transpired there.

## I.

Defendant raises two interrelated points regarding evidence of his intoxication. The first is that the trial court erred in excluding expert testimony by Dr. Eric Jolly that, when the murder was committed, defendant was suffering from an alcoholic blackout because such evidence negates the "knowing element of second degree murder." See § 565.021.1(1). The other point is a claim of error in giving MAI–CR3d 310.50. In both points, defendant claims the trial court's action had the effect of denying him due process.

## A.

The claim regarding the refusal of Dr. Jolly's testimony makes three assumptions. The first is that the rejected testimony was admissible as expert testimony. The second is that Dr. Jolly's testimony established that defendant was suffering from alcoholic blackout at the time of the crime. The third is that the issue of mental incapacity was properly before the trial court. None of the assumptions is correct.

Prior to calling Dr. Jolly, defense counsel disavowed his intent to advance the defense of diminished responsibility or mental

disease or defect. Defense counsel asserted that his purpose in calling Dr. Jolly was "no different from any testimony we might put on ... by other lay witnesses concerning what the state of mind or frame of mind was of defendant at the time." Dr. Jolly was thereafter allowed to testify concerning his study, as a psychologist, of memory and the effect of drugs and alcohol on one's ability to remember. The questioning was permitted to continue until defense counsel asked, "What type of behaviors are people in that particular state, alcoholic blackout, capable of performing?" The question evoked an objection to its relevancy, which was sustained.

Defense counsel requested the opportunity to make an offer of proof. His offer of proof went beyond merely obtaining an answer to that particular question and included a long colloquy on alcoholic blackout, which concluded with Dr. Jolly saying that one "in the midst of alcoholic blackout cannot perform knowingly." He was then asked specifically whether he had an opinion as to whether defendant was experiencing blackout at the time of the crime, to which Dr. Jolly responded, "Given *a tremendous amount of skepticism as to his state of mind*, it's my professional opinion he was in a state of blackout." (Emphasis added). The trial judge then reiterated his ruling that the testimony was irrelevant and added, "[S]uch expert testimony would not aid the jury in determining issues before the Court."

■ At no point in Dr. Jolly's testimony did he testify that his theories on blackout were accepted in the psychological or scientific community. Admission of an expert's opinion concerning scientific evidence depends upon wide acceptance in the relevant scientific community of its reliability. *State v. Taylor*, 663 S.W.2d 235, 239 (Mo. banc 1984). Defendant's failure to show widespread acceptance in the scientific community establishes that the trial court did not err in finding such testimony to be irrelevant.

■ Dr. Jolly never explained what he meant by the phrase "Given a tremendous amount of skepticism as to [defendant's]

state of mind," which was the qualification of his opinion that defendant was in a state of blackout. Such skepticism indicates that Dr. Jolly had doubts that he could reach any reliable conclusion as to defendant's mental state. Such comments firmly establish that Dr. Jolly's opinion was not based on the degree of scientific certainty necessary to qualify as an expert opinion.

■ Even assuming Dr. Jolly's opinions were based upon widely accepted scientific evidence, the essence of Dr. Jolly's testimony was not that defendant would have *difficulty* knowing and appreciating the consequences of his conduct. Dr. Jolly's testimony was that defendant was *incapable* of knowing the nature and consequences of his conduct. A defense of diminished capacity because the accused is incapable of forming the mental element necessary to commit a crime is necessarily based on evidence of a mental disease or defect as defined in § 552.010. *State v. Gill*, 806 S.W.2d 48, 50 (Mo.App.1991); *State v. Weatherspoon*, 716 S.W.2d 379, 384 (Mo. App.1986), *cert. denied*, 479 U.S. 1095, 107 S.Ct. 1313, 94 L.Ed.2d 167 (1987). Evidence of a mental disease or defect is not admissible at trial unless the accused pleads the defense or notifies the court in writing of intent to rely on the defense within ten days after the plea or at such later date as the court may for good cause permit. § *552.030.2*. In this case, not only was the defense not properly raised, but defense counsel took pains to disclaim such a defense.

■ The admission of expert testimony is a matter within the sound discretion of the trial court. *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). Where expert testimony is not offered as a diagnosis of mental disease or defect showing a defendant was incapable of having a specific mental state, the opinion is merely a conclusion that can be drawn by a juror. It is the jury alone, under proper instructions, that is responsible for determining whether the defendant had the requisite mental state. *State v. Clements*, 789 S.W.2d 101, 110 (Mo.App.

1990). To the extent that Dr. Jolly's opinion was a conclusion that could be drawn by jurors, it was superfluous. *See* 7 Wigmore, *Evidence*, §§ 1917, 1918 (Chadbourn rev. 1978). The trial judge did not abuse discretion in rejecting Dr. Jolly's testimony because it did not "aid the jury in determining the issues." Because the opinion was not shown to be admissible as expert testimony and the defense of mental disease was not properly raised, the due process issue need not be reached.

### B.

The second and more troubling question is whether the instruction on defendant's intoxication, patterned after MAI–CR3d 310.50, violates the defendant's right to due process of law because the instruction effectively creates a presumption that an intoxicated person has the requisite mental state, relieving the state of its constitutional burden of proving all elements of the offense beyond a reasonable doubt.[2] The instruction to which defendant objects reads as follows: "You are instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct."

In *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), an instruction was given in a murder case that "the law presumes that a person intends the ordinary consequences of his voluntary acts." The offense with which defendant was charged required a determination that the defendant "purposefully and knowingly" caused the victim's death. *Id.* at 512–13, 99 S.Ct. at 2452–53. The Supreme Court reversed the conviction because a reasonable juror possibly understood the instruction to create either a conclusive or burden shifting presumption that defendant had the requisite mental state. "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a rea-

sonable doubt *of every fact* necessary to constitute the crime with which he is charged." (emphasis in original). *Sandstrom* at 520, 99 S.Ct. at 2457, quoting *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

The rule relied on by the state to justify the giving of the instruction, that is, intoxication is no defense or justification, may be traced to *State v. Harlow,* 21 Mo. 446 (1855). There a defendant charged with murder tendered two instructions which were refused by the court. The first was "That, although drunkenness is no justification for the killing, yet the jury may take it into consideration, in determining the intent with which the defendant did the act." The second instruction directed that if the jury believed defendant was so intoxicated that he was unable "to act as a sane and rational man ... they must find defendant not guilty." 21 Mo. at 458. In affirming the refusal to give the instructions, the Court noted that it was criminal for a person to "make himself a drunkard." *Id.* The Court went on to point out that the jury was given a proper instruction on the issue of intent, which stated in part, "[T]hat the question of doubt or innocence ... depends entirely, and must be determined alone by the intention which actuated the defendant in the killing; that, in determining the motive ... [the jury] must take into consideration all facts and circumstances in the case." 21 Mo. at 458–59.

When the new criminal code was enacted in 1978, the *Harlow* rule was modified briefly by statute, § 562.076.1, RSMo 1978, which stated:

A person who is in an intoxicated or drugged condition ... is criminally responsible for conduct unless such condition

(1) Negatives the existence of the mental states of purpose or knowledge when such mental states are elements of the offense charged or of an included offense; or

**2.** As noted by the court of appeals, the point is not artfully stated in the brief and requires

some amplification to fully comprehend.

(2) Is involuntarily produced and deprived him of the capacity to know or appreciate the nature, quality or wrongfulness of his conduct or to conform his conduct to the requirements of the law.

The statute also required that the defendant had the burden of injecting the issue of intoxication or drugged condition into the case. § *562.076.2*, RSMo 1978. During the period the statute was in effect, form instructions were adopted informing the jury on the impact of intoxication on criminal responsibility. *MAI–CR2d 3.30.1*. In 1983, the statute was amended and essentially removed the first subparagraph quoted above. The effect of that was to return the law to the state as it existed under *Harlow* except to the extent the rule was modified by §§ 562.076.1 and 552.010, relating to the defense of diminished capacity.

The decision in *Harlow* led to a corollary rule prohibiting jurors from considering intoxication on the issue of specific intent. This corollary rule dates to *State v. Cross*, 27 Mo. 332 (1858), decided just three years after *Harlow*. From its inception in *Cross*, the corollary rule was criticized as forbidding a jury from considering relevant evidence on the issue of the defendant's mental state. *See* 27 Mo. at 338–39 (Richardson, J., dissenting). The rule in *Cross* was rooted in the common law and in society's reproach toward persons who are voluntarily intoxicated. "A mistake or accident may happen to a man, whether drunk or sober, and if they are more likely to occur when in the former predicament, he is not entitled to any advantage over the sober man by reason of this." *Cross* at 337.

More than one hundred years later in *State v. Richardson*, 495 S.W.2d 435 (Mo. banc 1973), the defendant attempted to raise the defense of mental incapacity due to intoxication. This Court acknowledged that Missouri is in the minority regarding the rule in *Cross* but declined to follow the majority of jurisdictions, because there no offer of proof was made showing the defendant was incapacitated by reason of his

intoxication. 495 S.W.2d at 440. Apparently, in *Richardson* no claim was made that the second aspect of the rule violated the defendant's due process rights. We now reconsider both aspects of the rule.

█ The first aspect of the rule as articulated in *Harlow* is reaffirmed. Even though all evidence shows the defendant was voluntarily intoxicated when the crime was committed, the defendant shall not be entitled to a directed verdict due to a failure to prove the necessary mental state. Neither shall a defendant be entitled to an instruction that the jury may consider evidence of voluntary intoxication in determining if the defendant had the requisite mental state. That aspect of the rule does not relieve the state of its burden of proof.

█ The second aspect of the rule is that a jury may not consider intoxication on the issue of the defendant's mental state. Exclusion from consideration of evidence of voluntary intoxication in no way relieves the state of its burden of proof. The state is still obliged to prove all elements of the offense, including the mental state, beyond a reasonable doubt. The *Cross* rule merely treats a sober person and a voluntarily intoxicated person as equally responsible for conduct. The rule in *Cross* does not violate due process.

█ The ruling in *Cross* does not mandate an instruction regarding intoxication. The state's remedy when a defendant attempts to introduce evidence of intoxication on the issue of state of mind is to object to the relevancy of the evidence. That was the objection made by the state to Dr. Jolly's testimony. The objection was properly sustained. There may be situations where evidence of intoxication is relevant to some issue other than the defendant's state of mind.[3] In those rare situations the state's remedy may be to request an instruction that the evidence of intoxication is admitted only for a limited purpose. However, none of those situations exist here.

---

**3.** See for example *State v. Small*, 344 S.W.2d 49 (Mo.1961); *State v. Barr*, 336 Mo. 300, 78 S.W.2d 104 (1935), and *State v. Buxton*, 324 Mo. 78, 22 S.W.2d 635 (1929).

We turn now to the instruction, MAI–CR3d 310.50. The instruction is not a misstatement of law. However, the same may be said of the instruction in *Sandstrom, supra*. The critical question is whether a reasonable likelihood exists that the jury understands the instruction to relieve the state of its burden of proof as to a statutory element. The instruction here creates a reasonable likelihood that the jury would believe that if defendant was intoxicated, he was criminally responsible regardless of his state of mind. That reading has the effect of excusing the state from proving the defendant's mental state beyond a reasonable doubt and violates due process under *Sandstrom*.

MAI–CR3d 310.50 does not purport to be connected to any other instruction. It stands by itself as a comment on the evidence of intoxication.[4] A jury is at least as likely to assume the instruction relieves the state of its burden of proving the defendant's mental state as a jury is to simply disregard the evidence of intoxication. A defendant need not establish that the jury was more likely than not to have misapplied the instruction. It is sufficient that there is a "reasonable likelihood that the jury has misapplied the challenged instruction" in a way which violates the defendant's constitutional rights. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990).

The state claimed in oral argument before this Court, "Voluntary intoxication stands in the place of intent" under Missouri law. Implicitly, the state finds justification for MAI–CR3d 313.50 as a method of communicating that mistaken notion of Missouri law to the jury. If learned counsel for the state is confused on the law that justifies the instruction, it is disingenuous to argue that there is no reasonable likelihood that a jury of nonlawyers would misunderstand the import of the instruction.

Other instructions were given which correctly gave defendant a presumption of innocence and placed the burden of proof on the state as to all elements of the crime of second degree murder including whether defendant acted knowingly. However, an instruction relating to specific evidence which may be read to relieve the state of its burden of proof as to a mental state is not cured by another general instruction placing the burden on the state. The two instructions are contradictory. A jury is as likely as not to resolve the contradiction favorably to the state. That likelihood requires the court to grant relief. *Francis v. Franklin*, 471 U.S. 307, 322, 105 S.Ct. 1965, 1975, 85 L.Ed.2d 344 (1985).

If the giving of the instruction is error, it will be held harmless only when the Court can declare its belief that it was harmless beyond a reasonable doubt. *Rose v. Clark*, 478 U.S. 570, 583, 106 S.Ct. 3101, 3109, 92 L.Ed.2d 460 (1986). Where a substantial issue exists regarding the defendant's state of mind, it is impossible to say the error is harmless beyond a reasonable doubt.

It is suggested that § 562.076.1 mandates the giving of MAI–CR3d 310.50. Although that statute was amended in 1983, its present version does not say a jury shall be instructed regarding intoxication. Section 562.076.1 has two elements. The first is that intoxicated persons, like sober persons, are "responsible for conduct." The second part limits the circumstances in which an intoxicated person may rely on the defense of diminished capacity to a situation where the intoxicated condition "is involuntarily produced and deprived [the accused] of the capacity to know and appreciate the nature, quality or wrongfulness of his conduct." Like the rule in *Cross*, the statute merely places an

---

4. So far as can be discerned, MAI–CR3d 310.50 is unique among all approved instructions in that it is a comment on evidence, albeit irrelevant evidence. There are limitless factors, e.g., race, gender, religion, education, etc., that "do not relieve a person of criminal responsibility," but no form instruction is given on those factors. As a general principle, singling out specif-

ic facts for comment in a jury instruction is impermissible. Such instruction diverts attention away from other relevant evidence and threatens a defendant's right to have a jury decide factual issues. *State v. Denison*, 352 Mo. 572, 178 S.W.2d 449, 456–57 (1944); *State v. Swarens*, 294 Mo. 139, 241 S.W. 934, 939 (1922).

intoxicated person on a level footing with a sober person as to the mental elements of an offense and places limitations on the defense of diminished capacity due to intoxication. To read more into § 562.076.1 is to go beyond the plain language of the statute.

Because MAI–CR3d 310.50 implicitly relieves the state of proving an element of an offense as established by the legislature, the instruction violates due process. MAI–CR3d 310.50 should not have been given and is not to be given in any case in the future. This ruling shall be applicable only in cases tried in the future and cases now subject to direct appeal where the issue is preserved that MAI–CR3d 310.50 violated due process because it relieved the state of its burden of proof as to the requisite mental state.

In reaching this conclusion, it should be abundantly clear that criminal defendants shall not be permitted to call expert witnesses to draw conclusions regarding specific mental states unless the opinion is relevant to establish that the defendant lacks mental capacity. The circumstances under which intoxication may be relied upon to establish the defense of diminished mental capacity is not properly before us in this case and, therefore, need not be decided. *See* §§ *562.076* and *552.-010. See also State v. Preston*, 673 S.W.2d 1, 8 (Mo. banc 1984); *State v. Williams*, 812 S.W.2d 518, 520 (Mo.App.1991); and *State v. Shipman*, 568 S.W.2d 947, 950 (Mo.App.1978).

## II.

The only other issue raised which is likely to occur on retrial is a complaint that the trial court erred in admitting a videotaped interview of defendant along with a corresponding transcript of that interview. Defendant asserts that the videotape was unreliable because substantial portions of it were inaudible, thus denying him due process of law.

In this case, both the prosecution and defense agreed that portions of the tape were inaudible. Both sides agreed that a transcript was necessary to the jurors' understanding of the full context of the statements. "[T]ranscripts may be used if portions of the tape are inaudible or there is a need to identify the speakers." *State v. Engleman*, 653 S.W.2d 198, 200 (Mo.1983). Defendant alleges no inaccuracy in the transcript; he makes no argument of fundamental unfairness. He argues only that the inaudible tape will allow the jury to speculate. An independent review of the record fails to disclose any inaccuracy or fundamental unfairness. In short, defendant was not prejudiced by the use of the videotape and its accompanying transcript. The point is denied.

## CONCLUSION

Other claims were raised on appeal that may not recur when the case is retried. Therefore, those claims need not be addressed at this time. The judgment is reversed and the cause remanded for a new trial.

ROBERTSON, C.J., and COVINGTON and THOMAS, JJ., concur.

LIMBAUGH, J., dissents in separate opinion filed.

BENTON and PRICE, JJ., concur in opinion of LIMBAUGH, J.

LIMBAUGH, Judge, dissenting.

I respectfully dissent from the majority's holding that Missouri's voluntary intoxication instruction, MAI–CR3d 310.50, violates the defendant's right to due process of law.

## I.

On the basis of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the majority concludes that the voluntary intoxication instruction "effectively creates a presumption that an intoxicated person has the requisite mental state, relieving the State of its constitutional burden of proving all elements of the offense beyond a reasonable doubt." If that conclusion is correct, there is unquestionably a due process violation. *Sandstrom*, 442 U.S. at 521, 99 S.Ct. at 2458. I dissent

because of my firm belief that MAI–CR3d 310.50, unlike the instruction in *Sandstrom*, cannot be construed by jurors to relieve the State of the burden of proving the requisite mental state.

The *Sandstrom* instruction stated that "[t]he law presumes that a person intends the ordinary consequences of his voluntary act." Under the Supreme Court's reasoning, this instruction could be construed by jurors to contradict the burden of proof instruction that requires the State to prove, *inter alia*, that defendant acted "purposely or knowingly." The Court found that the jury might have resolved the contradiction either by applying what was perceived to be a conclusive presumption that the defendant had the criminal intent to commit the offense or by requiring the defendant to rebut the perceived presumption that he had that criminal intent. In either scenario, the State would be relieved of its burden of proof.

The majority acknowledges that the voluntary intoxication instruction, MAI–CR3d 310.50, contains no weighty *presumption* which on its face contradicts the burden of proof instruction. Nevertheless, the majority speculates that a juror might be so confused or misled by the instruction, "that even though the juror believes the accused does not have the specific mental state required by law, if at the time the accused was voluntarily intoxicated, then the accused is criminally responsible." By that reasoning, the majority finds that the State might effectively be relieved of the burden of proof on the issue of intent. But, in my view, such a construction by jurors, or by anyone else, is illogical and contrary to the instruction's plain language.

MAI–CR3d 310.50 states: "You are instructed that an intoxicated condition will not relieve a person of responsibility for his conduct." This instruction does not tell the jury that the defendant is criminally responsible for his conduct *if* he was voluntarily intoxicated, or *because* he was voluntarily intoxicated, and certainly, there is no presumption to either effect. Unlike *Sandstrom*, the defendant in this case was not required to prove that he did not act knowingly, i.e., he did not have the burden of disproving the requisite mental state. Nor was the jury free to ignore the burden of proof instruction so that the burden of proving criminal responsibility would be transferred from the State to the defendant. In this case, the burden of proof instruction, the voluntary intoxication instruction, and the verdict director, read fairly and in conjunction with each other, advise the jury that 1) the State bears the burden of proving beyond a reasonable doubt that defendant acted knowingly,[1] and 2) the defendant's voluntary intoxication does not excuse his conduct. The State was still required to prove that defendant acted knowingly; the defendant was required to prove nothing.

The majority's reliance on *Sandstrom* is all the more inappropriate in view of *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), which changed the standard of review for jury instructions alleged to be ambiguous and subject to erroneous interpretation. Under the *Sandstrom* standard, the question was whether a reasonable juror could have misunderstood the meaning of the instruction. *Sandstrom*, 442 U.S. at 516–17, 99 S.Ct. at 2455–56. Now, under *Boyde*, the inquiry is whether there is a "reasonable likelihood" that the jury erroneously interpreted the instruction. *Boyde*, 494 U.S. at 380, 110 S.Ct. at 1198. In explaining the adoption of the "reasonable likelihood" standard, the Court stated:

> This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. ... Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of

1. Here, the State did indeed submit evidence that would allow a jury to conclude beyond a reasonable doubt that defendant acted knowingly. As noted in the principal opinion, the victim, while asleep in bed, was shot *twice* in the head, and defendant admitted that "I can picture myself shooting [the victim] in his room."

meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

It is tenuous, at best, to conclude that a reasonable juror could have misinterpreted MAI–CR3d 310.50. It is sheer conjecture to go a step further and find a reasonable likelihood that the instruction was misinterpreted.

II.

Although the majority declares that MAI–CR3d 310.50 deprives the defendant of due process of law, it does not question the constitutionality of § *562.076.1, RSMo 1986*, the statute on which the instruction is based. The pertinent portion of § *562.076.1* provides that: "[a] person who is in an intoxicated or drugged condition ... is criminally responsible for his conduct ..." The majority holds that the statute does not mandate an instruction on voluntary intoxication, and so none should be given. But, in my opinion, if the statute is constitutional, it should be given full effect.

The majority would give partial effect to the statute, but only in the sense that the statute serves to make irrelevant any evidence of voluntary intoxication offered on the issue of a defendant's requisite mental state. Through this constricted interpretation, the majority converts § *562.076.1* from a substantive law into a mere rule of evidence. Recognizing the possibility of "those rare situations" in which evidence of voluntary intoxication might be properly introduced on some issue other than the defendant's mental state, the majority suggests that prosecutors may request a limiting instruction which would notify the jury that "the evidence of intoxication is admitted only for a limited purpose." In my view, such a limiting instruction is too narrow to convey the full import of the statute because the jury is not also instructed that evidence of voluntary intoxication cannot be considered to negate the State's showing of requisite mental state. In short, I do not agree that the majority can give full effect to the statutory rule that intoxication is no defense and yet disallow an instruction based on that rule.

This case presents a classic illustration of the need for an instruction that fully advises the jury on the law of voluntary intoxication. Given the admission of substantial evidence that defendant was voluntarily intoxicated, and absent the submission of MAI–CR3d 310.50, the jury could well reason that defendant's voluntary intoxication precludes a finding that the murder was committed "knowingly." This is exactly the result the legislature sought to avoid by enacting § *562.076.1*. To properly implement the statute, a court must give MAI–CR3d 310.50 so that the jury is made aware that voluntary intoxication cannot be considered on the issue of defendant's mental state.

III.

Under *Sandstrom v. Montana*, due process is violated when jury instructions can be construed to relieve the State of the burden of proving beyond a reasonable doubt the requisite mental state of the crime charged. I would hold that MAI–CR3d 310.50 is not susceptible to such a construction. To hold otherwise is to say that the jury would disregard the plain meaning of the language used and rewrite the instruction to state that persons are criminally responsible *if* they are intoxicated, or *because* they are intoxicated.

The conviction should be affirmed.