**STATE of Missouri, Respondent,**

v.

**Michael Brian DAY, Appellant.**

No. 18458.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 2, 1993.

Marcie W. Bower, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., F. Martin Dajani, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Defendant, Michael Brian Day, guilty of the class A felony of assault in the first degree, § 565.050, RSMo 1986, and assessed punishment at 20 years' imprisonment. The trial court entered judgment per the verdict.

Defendant appeals, asserting the trial court (1) committed plain error in instructing the jury that intoxication from alcohol will not relieve a person of responsibility for his conduct, and (2) erred by receiving in evidence, over Defendant's objection, three "cumulative, repetitious, gruesome, and unduly inflammatory" photographs of the victim's head and facial wounds.

Defendant does not dispute the sufficiency of the evidence to support the verdict. However, consideration of the assignments of error requires an account of the evidence.

The victim was Larry Joe Wingo. The assault occurred April 20, 1992, in his Springfield apartment.

Wingo testified that about a month earlier, he met Defendant, who was estranged from his wife, Shonda, and infant son, Devon. Wingo agreed to help Defendant find a job and to allow Defendant to live "temporarily" in Wingo's apartment. Wingo insisted there be no drunken parties, and suggested that if Defendant wanted to see Shonda, Defendant go to her apartment because Wingo "didn't want to get involved" in their problems.

Sometime after Defendant began residing in Wingo's apartment, Shonda started coming there with Devon, by bus, to visit Defendant. Wingo, who worked until 11:00 p.m., customarily returned to the apartment around 11:30. He testified that on the occasions when Shonda and Devon were there, he drove them back to their apartment.

After a "couple of weeks" of this, Wingo asked Defendant to forbid Shonda from coming, but Defendant replied he "had no control over it." Wingo feared the landlord would evict him because of "disturbances" when Shonda was there.

On April 20, 1992, Wingo returned from work between 11:30 and 11:45. Shonda was "out on the balcony." Wingo told her she needed to leave. Shonda said: "Larry, I'm divorcing Mike. I'm leaving Mike." Wingo saw Defendant going toward the kitchen holding four beer bottles.

Wingo went to his bedroom, paused to "clear" his thinking, then went to the bedroom Defendant occupied. Defendant was there with Devon. Wingo told Defendant, "Mike, I need to find you another place to live."

Wingo testified he went to the living room and suddenly heard "somebody coming from behind me." As Wingo turned, Defendant hit him on the side of the face and said, "I have a four-month-old baby, what do you expect me to do?"

Defendant continued hitting the startled Wingo. Wingo attempted to grab Defendant's fists, but Defendant was "too strong." Defendant landed 10 to 15 punches on Wingo's face and nose.

Wingo retreated toward the door which opened into the hallway outside the apartment. Defendant pulled Wingo away from it, propelling him to the floor. As Wingo attempted to rise, Defendant seized an oak chair and struck Wingo on the head with it. The blow broke the chair.

Wingo again tried to rise, but Defendant struck Wingo over the head with a second chair, breaking it. As Wingo made a third effort to rise, Defendant broke a third chair over his head. At that point, according to Wingo, "I fell ... on my back, and I was bleeding real bad, I ... couldn't hardly see."

Defendant jumped astraddle the prone Wingo and continued pummeling his head. Wingo said, "Mike, stop, you're killing me."

Wingo hollered for someone to call 911 or the police. Then, recounted Wingo, Defendant put his hands around Wingo's throat

and began choking him. Someone "banged on the door." Defendant released Wingo, stood up, and walked out.

Wingo made his way to the balcony, climbed over the rail, and lowered himself to the balcony of the apartment below. He remained there until police and an ambulance arrived.

Shonda Day, presented as a witness by the State, testified Defendant was sad, upset, depressed and intoxicated when she arrived at Wingo's apartment April 20, 1992. Upon Wingo's arrival, she heard him tell Defendant, "All right, Mike, pack your stuff."

Shortly afterward, Shonda saw Defendant approach Wingo. She knew Defendant "was getting ready to do something." Shonda said, "Mike, don't," and, "Larry, run." Then, according to Shonda, "[A]ll I seen after that was Mike throwing punches at Larry in the corner by the table." Shonda never saw Wingo hit Defendant.

Shonda used the phone in Wingo's bedroom to call 911. Then, she ran into Defendant's bedroom, grabbed Devon, and fled the apartment. As she departed, she saw Defendant "still beating on Larry."

Wingo was taken by ambulance to a nearby hospital, where he was examined by Scott Kensel, a physician in the emergency department. Asked about Wingo's condition, Dr. Kensel testified, "[H]e was covered in blood and had a lot of lacerations." The most serious ones were on Wingo's scalp and face.

Kensel was shown State's Exhibits 12, 13, and 14 (the subjects of Defendant's second point relied on), which Kensel identified as photographs showing Wingo's condition upon arrival. Using the photographs, Kensel described Wingo's lacerations for the jury. Asked whether Wingo was at risk of bleeding to death from the scalp wounds, Kensel replied, "[P]eople have bled to death from scalp wounds before[.]" The aggregate length of the scalp wounds repaired by Kensel was "almost three feet." Wingo's facial wounds were "almost as much." Kensel's testimony continued:

Q So we're talking five to six feet of lacerations total, Doctor?

A When you line them all up end to end.

Wingo testified he was hospitalized nine days, four or five of which were in intensive care. After release, he had trouble with his balance two or three weeks, and was off work almost two months. According to Wingo, he had over 120 stitches on his head, a fractured jaw, a bruised kidney, and his nose and sinuses had to be rebuilt by plastic surgery.

Defendant testified Wingo entered the apartment about 11:30 p.m., April 20, 1992, and "immediately got mad" because Shonda and Devon were there. Defendant avowed Wingo asked him to tell Shonda to leave. Defendant did not do so. Wingo then told Shonda to leave. Defendant's testimony continued:

[Wingo] started coming off he wanted me to sleep with him and he talked about taking a month off ... in ... June or July, and go to Florida, and he said he wanted to take me to Disney World, and, you know, for the summer. And, you know, if I would sleep with him, and he put his hands on me.

Q Where did he put his hands?

A On my rear end and on my back. . . . You know, just putting his hands all over me.

According to Defendant, he was "stunned" by this, and reacted by hitting Wingo on the face and body. Wingo fought back. The brawl continued until two men from another apartment knocked on the door. When that occurred, said Defendant, he withdrew from the fray, exited the apartment, and remained on the grounds until police arrived. Asked how the chairs got broken, Defendant explained he was in a "rage" and was "destroying things." Defendant denied hitting Wingo with the chairs.

In rebuttal, Wingo testified he never asked Defendant to sleep with him and never put his hands on Defendant until Defendant hit him.

Instructions given the jury by the trial court included Instruction 5 (MAI–CR3d 310.50), which read:

You are instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct.

Citing *State v. Erwin*, 848 S.W.2d 476 (Mo.banc 1993), Defendant maintains the giving of Instruction 5 was plain error. In *Erwin*, the accused was convicted by a jury of murder in the second degree. On appeal, he argued MAI–CR3d 310.50—given by the trial court—violated his due process rights by relieving the State of its burden of proof as to his mental state. 848 S.W.2d at 478, 481. The Supreme Court of Missouri held:

> Because MAI–CR3d 310.50 implicitly relieves the state of proving an element of an offense as established by the legislature, the instruction violates due process. MAI–CR3d 310.50 should not have been given and is not to be given in any case in the future. This ruling shall be applicable only in cases tried in the future and cases now subject to direct appeal where the issue is preserved that MAI–CR3d 310.50 violated due process because it relieved the state of its burden of proof as to the requisite mental state.

848 S.W.2d at 484[15].

▪ Defendant was tried five months before *Erwin* was decided. Defendant registered no objection to Instruction 5 at trial, and did not mention it in his motion for new trial. Consequently, no complaint about Instruction 5 is preserved for appellate review. *State v. Moland*, 626 S.W.2d 368, 370[1] (Mo. 1982). That being so, it is clear from the above-quoted passage from *Erwin* that its disapproval of MAI–CR3d 310.50 cannot be used by Defendant as the basis of a claim of instructional error. Indeed, it is arguable that *Erwin* does not even provide underpinning for plain error review.

▪ However, assuming—without deciding—that Defendant can use *Erwin* as a basis for a plain error claim, we find no reason for reversal. That is because instructional error amounts to plain error only if a trial court so misdirects, or fails to instruct, a jury as to cause manifest injustice or miscar-

riage of justice. *State v. Parkus*, 753 S.W.2d 881, 887–88[13] (Mo.banc 1988), *cert. denied*, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988).

Defendant points out (1) he was charged with, and found guilty of, knowingly causing serious physical injury to Wingo, and (2) there was evidence he had ingested alcohol before the incident. Defendant's contention, as we comprehend it, is that but for Instruction 5, the jury could have easily acquitted him by reasonably finding that because of his intoxication, he did not knowingly inflict harm on Wingo. Defendant argues, "Instruction No. 5 creates a reasonable likelihood that the jury would believe that if [Defendant] was intoxicated, he was criminally responsible, regardless of his state of mind."

▪ We find no merit in Defendant's thesis. At trial, he did not explain his attack on Wingo by saying he was intoxicated and consequently did not knowingly cause Wingo's injuries. Instead, Defendant testified he was provoked by Wingo's homosexual advances. Defendant described his mental state as "rage."

Defendant gave the jury a detailed account of the incident, starting with Wingo's entry into the apartment. Defendant recounted Wingo's ire when he saw Shonda and Devon, and Wingo's admonition to Defendant that Shonda and Devon should leave. Defendant described where his first punches landed, and where Wingo's retaliatory blows landed. Defendant testified about knocking down a clock and breaking the chairs. Defendant told the jury he left the apartment upon hearing the knock at the door, and remained in the area until arrested. He even testified about asking the officers to allow him to get up off the "concrete" after his arrest. According to Defendant, he made this request because the concrete was cold and he was wearing no shirt.

In closing argument, Defendant's lawyer [1] said:

> [O]n April 20th of 1992, Mike Day had reached the breaking point. And at that

1. The lawyer representing Defendant in this appeal is not the lawyer who represented him at trial.

moment, Mike no longer saw Larry as a friend, as a benefactor, but as a devisive [sic], a malevolent being who was asserting himself between Mike on the one hand and Shonda and Devon on the other. Instead of bringing Mike together, Larry was tearing them apart. At least this is how Mike sees things. Larry forced Mike to choose between Larry or Mike's wife and son. So Mike lashed out....

Clearly, Defendant did not attempt to convince the jury he was so intoxicated that he did not knowingly inflict Wingo's injuries. Because that was not Defendant's theory of defense, Instruction 5 caused no manifest injustice or miscarriage of justice.

Defendant's other claim of error, as noted *supra*, concerns the receipt in evidence of three photographs. They accompany the record on appeal. Each is in color, and each shows Wingo's head from a different angle. At trial, Dr. Kensel testified each depicts Wingo's condition upon arrival at the emergency room. Each shows multiple lacerations and profuse bleeding. In two, a ruler is beside a laceration to show its length.

Defendant objected that the photographs were gory and gruesome, and their potential for prejudicing the jury outweighed their probative value. The trial court received the photographs in evidence over that objection.

■ Citing *State v. Wood*, 596 S.W.2d 394, 403 (Mo. banc 1980), *cert. denied*, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980), Defendant correctly asserts that photographs of a victim's body should not be admitted in evidence where their sole purpose is to arouse the emotions of the jury and to prejudice the accused. However, *Wood* also says:

It is within the discretion of the trial court to determine whether potentially prejudicial or inflammatory evidence should be admitted, and relevancy is the principal criterion. Relevant evidence is not inadmissible because it is prejudicial. Nor is it a valid objection that a witness had described matters depicted in the photographs if it is otherwise relevant.

596 S.W.2d at 403[22–24] (citations omitted).

Defendant cites two other cases, *State v. Robinson*, 328 S.W.2d 667 (Mo.1959), and *State v. Floyd*, 360 S.W.2d 630 (Mo.1962). In each, admission of photographs of a dead body was held reversible error. However, in each case the photographs had no probative value. Each case recognized photographs of a victim are admissible for sundry purposes, including illustration of the nature, location and extent of wounds. *Robinson*, 328 S.W.2d at 671; *Floyd*, 360 S.W.2d at 632.

Here, the State had the burden of proving, beyond a reasonable doubt, that Defendant knowingly caused Wingo serious physical injury. The verdict-directing instruction defined serious physical injury as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body."

■ The three photographs in issue were relevant to whether Wingo's wounds amounted to "serious physical injury," an element of the crime. The photographs were also relevant to whether Defendant *knowingly* caused Wingo serious physical injury. Arguably, the wounds shown in the photographs are consistent with wounds from blows by a chair (Wingo's testimony), not a fist. Striking someone with a chair is arguably stronger evidence of intent to cause serious physical injury than striking someone with a fist. The number of wounds shown by the photographs is further evidence of knowingly causing serious physical injury.

The trial court is vested with broad discretion in the admission of photographs. *State v. Feltrop*, 803 S.W.2d 1, 10 (Mo. banc 1991), *cert. denied*, —— U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). Photographs, although gruesome, may be admitted where they show the nature and location of wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the State's case. *Id.*, 803 S.W.2d at 10.

■ Insofar as the photographs here are gruesome, it is because they accurately show the grisly result of Defendant's attack. *See: State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc 1988), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). If a photograph is relevant, it should not be excluded

**496**

because it may be inflammatory, unless the situation is so unusual that the extent of the prejudice overrides the photograph's probative value. *Id.,* 744 S.W.2d at 772[21]. No unusual circumstances exist here. The trial court did not abuse its discretion in receiving the photographs in evidence.

Judgment affirmed.

FLANIGAN, P.J., and PREWITT, J., concur.