STATE of Missouri, Plaintiff–
Respondent,

v.

Phillip C. BRISTOW, Defendant–
Appellant.

No. 26825.

Missouri Court of Appeals,
Southern District,
Division Two.

March 31, 2006.

Motion for Rehearing or Transfer
Denied April 24, 2006.

Application for Transfer Denied
May 30, 2006.

Craig A. Johnston, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Robert J. (Jeff) Bartholomew, Office of the Atty. Gen., Jefferson City, for Respondent.

KENNETH W. SHRUM, Presiding Judge.

A jury convicted Phillip Bristow ("Defendant") of assault in the first degree (§ 565.050) and armed criminal action (§ 571.015).[1] The trial court sentenced him to concurrent terms of fifteen years' and seven years' imprisonment for the two crimes, respectively. The dispositive point on appeal involves a jury instruction, namely, one patterned after MAI–CR3d 310.50 which advised the jury that voluntary intoxication was no defense to the charged crimes. Defendant argues that the instruction lacked evidentiary support and insists this constituted reversible error because (1) it confused and misled the jury and (2) it prevented the jury from properly considering his claim of self-defense. This court agrees. We reverse and remand.

## FACTS

On December 31, 2003, Jimmy Ray Fry, Jr. ("Victim") and three friends went to Cowboys 2000 (a bar) in Springfield, Missouri, to celebrate New Year's Eve. When they arrived around 8:30 p.m., Victim had consumed one beer; he then drank between five and six mixed drinks (bourbon and coke) during the ninety minutes he was at the club.

On that same evening, Defendant arrived at the club with a friend between 9:00 and 9:30 p.m. During that day and before going to the bar, Defendant had "probably" drunk eight beers beginning at noon, and he was drinking his first beer at the bar when he encountered Victim. Defendant testified he "didn't believe he was intoxicated" that evening, he was not slurring his speech or stumbling, and he had driven to the club. In fact, during closing arguments, the prosecutor told the jury that nobody involved in the crimes was "particularly intoxicated."

Defendant and Victim did not know each other. Defendant testified his contact with Victim started when Victim "blatantly stepped all over my foot." Victim's version was that he first encountered Defendant when Defendant "bumped into" him as he (Victim) was walking along. They went on their way but encountered one another again approximately thirty minutes later. Defendant testified that Victim again stepped on his boots, and this time, he (Defendant) "stuck out my arm" to push Victim back because it looked like he was going to fall on Defendant's girlfriend.

Contrarily, Victim claimed that he was walking along when Defendant "stopped me dead in my tracks and ... kind of shoves me back." At some point, Victim's friend (David Griner) came between Victim and Defendant, attempting to act as a peace-maker. By the time Griner got involved, Defendant and Victim were yelling and cursing at each other.

According to Defendant, Victim threatened to "whup" and hurt Defendant. Defendant also testified that Griner warned Defendant that Victim would hurt him. Even so, Defendant claimed he started to walk away when he heard Victim say "he'd kill" Defendant. Thereon, Defendant turned around and questioned Victim about what he said. According to Defendant, Victim repeated his statement to kill, whereon Defendant felt "threatened." Defendant testified that after Victim threatened a third time to kill Defendant, he (Victim) was trying to "work his way around ... Griner[ ]" and at the same time

1. All statutory references are to RSMo (2000), unless indicated otherwise.

Victim reached around "like to either his back pocket or the small of his back."

At that point, Defendant believed Victim was reaching for a weapon. Accordingly, Defendant, being uncertain whether Victim was reaching for a gun or knife, drew his knife from its sheath which he was carrying "[i]n the small of [his] back." Thereon, Defendant "defended [himself]" by trying to stab Victim in the shoulder, but missed and "got him in the chest."

Victim told a different story. He conceded that he told Defendant he was going to "whip his ass" but denied that he ever threatened to kill Defendant. He admitted that he was carrying a knife with a three-inch blade that night but denied ever reaching for the knife or for anything else with which to harm Defendant. Victim denied ever reaching around Griner to strike or otherwise harm Defendant. He testified he saw Defendant's arm "come over" Griner, whereon he "got hit in the chest." At first, Victim believed he had been shocked, but soon realized he had been stabbed in the chest. Victim then fled toward the front door, but collapsed.[2] At the same time, Defendant fled the bar and was finally apprehended twenty-eight days later in Texas.

At Defendant's criminal trial, the only real issue was whether Defendant acted in self-defense. In making this determination, credibility was key for the jury because the various eyewitnesses to the stabbing (including Defendant and Victim) told different versions, i.e., key portions of the accounts failed to match up with key parts of other witnesses' testimony. The jury convicted Defendant and this appeal followed.

## DISCUSSION AND DECISION

■ Defendant's second point charges the trial court committed reversible error when it gave the jury Instruction No. 13, submitted by the State, over his timely objection.[3] The instruction at issue here tracked MAI–CR3d 310.50. Specifically, it told the jury that,

"The State must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct."

Defendant argues that it was error to give the instruction because the record lacks evidence that he was intoxicated. He argues this was prejudicial error because the instruction had the potential for misleading or confusing the jury. Defendant insists this potential exists because he did not try to defend the charges against him by claiming he was intoxicated[4], nor did he try to excuse his flight from the bar by claiming he was intoxicated[5], nor did he

2. Victim was taken to the hospital with what a physician described as a "life threatening" stab wound to the chest. The blade of Defendant's knife missed Victim' heart and vital arteries but entered a lung and caused a partial collapse thereof.

3. We start with Defendant's second point because it is dispositive and leads to reversal and remand. We opt not to address his first point because it is unlikely that the issue will arise again, i.e., whether error resulted from admission into evidence of three knives taken from Defendant twenty-eight days after the incident. Because that issue is fact-driven and dependent upon trial strategy, any discussion thereof would be advisory only.

4. Under section 562.076, evidence of intoxication is inadmissible in a criminal trial to negate a mental element of a charged crime, but is admissible "when otherwise relevant on issues of conduct." § 562.076.3; *State v. Roberts*, 948 S.W.2d 577, 588–89 (Mo.1997).

5. "Conduct evidence to which voluntary intoxication is relevant under section 562.076.3 is most often failure-to-act evidence. This is

admit any wrongdoing.[6] As Defendant correctly points out, the record shows the contrary, namely, that he consistently relied upon a theory of self-defense without every admitting any wrongful conduct.

Section 562.076 is one of the sources or bases for the MAI–CR3d 310.50 pattern instruction. The relevant part of that statute provides:

"1. A person who is in an intoxicated ... condition ... from alcohol is criminally responsible for conduct....

"2. The defendant shall have the burden of injecting the issue of intoxicated ... condition.

"3. Evidence that a person was in a voluntarily *intoxicated ... condition* may be *admissible* when otherwise *relevant on issues of conduct* but in no event shall it be admissible for the purpose of negating a mental state which is an element of the offense. In a trial by jury, the jury shall be so instructed when evidence that a person was in a voluntarily intoxicated ... condition has been received into evidence." (Emphasis added.)

Among other things, this statute reflects the long-standing public policy of Missouri "prohibiting jurors from considering intoxication on the issue of specific [or general] intent." *State v. Erwin*, 848 S.W.2d 476, 482 (Mo.banc 1993) (citing *State v. Cross*, 27 Mo. 332 (1858)). As the *Erwin* court explained, "[t]he rule in *Cross* was rooted in the common law and in society's reproach toward persons who are voluntarily intoxicated" and the *Cross* rule "merely treats a sober person and a voluntarily intoxicated person as equally responsible for conduct." *Erwin*, 848 S.W.2d at 482.

Even so, section 562.076.3 states the obvious, namely, the jury is to be instructed on this subject only "when evidence that a person was in a voluntarily intoxicated or drugged condition has been received into evidence."[7] This comports with the general rule regarding any instruction in a criminal case, i.e., "[i]nstructions must be based on substantial evidence and reasonable inferences drawn therefrom." *State v. Perry*, 35 S.W.3d 397, 398[2] (Mo.App. 2000). More to the point, in *Kehner*, 886 S.W.2d at 133–34, and *State v. James*, 869 S.W.2d 276, 278 (Mo.App.1994), the eastern district ruled it was reversible error to give the MAI–CR3d 310.50 instruction when the evidence was insufficient to infer that an accused was intoxicated at the time of the alleged crime.

because a defendant's *failure* to act raises inferences of a guilty mind." *Roberts*, 948 S.W.2d at 589. Flight from the scene of an alleged crime due to intoxication is an example of such conduct. *State v. Hefflinger*, 101 S.W.3d 296, 301 (Mo.App.2003). For instance, a defendant could argue that because of intoxication, he or she was not thinking clearly, and that impaired reasoning process led to the flight from the scene and not because he or she was guilty.

6. In *State v. Kehner*, 886 S.W.2d 130 (Mo.App. 1994), the court held that giving MAI–CR3d 310.50 was prejudicial in that it was likely to confuse or mislead the jury into believing that the defendant admitted to some wrongdoing and was attempting to escape liability based on intoxication when the defendant did not attempt to defend the charges against him by arguing that he was intoxicated, did not raise the issue of intoxication, and was claiming self-defense. *Id.* at 134.

7. Section 562.076 reiterates and codifies the common law that evidence of voluntary intoxication is inadmissible on the issue of the defendant's mental state. *Roberts*, 948 S.W.2d at 588. Section 562.076.3 creates an exception to this general rule. *Id. See* n. 5. These instances, however, are not the only time when voluntary intoxication evidence may be admissible. *See Erwin*, 848 S.W.2d at 482 n. 3; *State v. Caston*, 509 S.W.2d 39, 41 (Mo.banc 1974); *Lagud v. Kansas City Bd. of Police Comm'rs.*, 136 S.W.3d 786, 793–94 (Mo.banc 2004).

The question is what constitutes sufficient evidence of a voluntarily intoxicated condition to trigger the giving of MAI–CR3d 310.50. The 1995 revision of "Notes on Use" concerning this instruction does not answer this question, i.e., it provides no guidance about what evidence is sufficient to support an inference of intoxication. The only relevant "Notes on Use" comment beneath MAI–CR3d 310.50 (as currently written) is the following: "1. See Section 562.076, RSMo 1994, and *State v. Erwin,* 848 S.W.2d 476 (Mo.banc 1993). This 1995 revision is to the Notes on Use only."

The problem is one of defining the term "intoxicated condition." Defendant asserts there must be evidence showing some level of impairment while the State claims that *any* evidence of consumption of alcohol (no matter how small) is sufficient to justify the giving of MAI–CR3d 310.50. The definitional problem is exacerbated in our case due to the unique factual situation presented here.

To solve this problem, the "Notes on Use" refer to the statute and case law, but neither section 562.076 nor *Erwin* gives guidance about whether the instruction was properly given in the factual context of this case. The "context" here includes (1) the State first proffered evidence about Defendant's drinking via cross-examination of Defendant's witness; (2) Defendant testified he "didn't believe he was intoxicated" and explained why, namely, his consumption of eight beers had occurred over an approximate time period of nine to nine and one-half hours, he was not slurring his speech nor stumbling, and he had driven to the bar; (3) the prosecutor in closing argument conceded the evidence did not show anyone was "particularly intoxicated;" (4) Defendant never used nor alluded to intoxication to rebut claims by the State that Defendant's flight showed guilt; and

(5) no evidence of intoxication existed other than the question of whether consumption of eight beers over a nine to nine and one-half hour period permitted an inference of intoxication that would warrant giving the instruction.

On this record, we find it was error to give this instruction. We refuse to accept the State's argument that *any* evidence of alcohol consumption is sufficient to show an "intoxicated condition." We are persuaded Defendant is correct when he asserts that there must be evidence showing some level of impairment resulting from an intoxicated condition before MAI–CR3d 310.50 is proper.

To begin, the phrase "intoxicated condition" is not defined in section 562.076. Even so, at one point in time, the Notes on Use governing MAI–CR3d 310.50 contained this:

"If ... it may be fairly inferred from the evidence that the defendant was intoxicated ... to such an extent that his judgment and actions were substantially affected thereby, or that his capacity to know or appreciate the nature, quality, or wrongfulness of his conduct was significantly impaired by reason of intoxication, this instruction ... must be given upon written request ... by the state.... Even though there is evidence of consumption of alcohol ..., if there is no evidence from which such impairment could be inferred, this instruction may not be given over the objection of the defendant."

MAI–CR3d 310.50, Notes on Use (4) (1987). Later, the 1995 revision of the Notes on Use eliminated all such language, and as indicated above, there is now no guidance in the Notes on Use.

We need not speculate about why the change was made. Suffice it to say, however, that we do not interpret the change in the Notes on Use to mean that the State

is entitled to submission of an MAI–CR3d 310.50 instruction any time there is evidence of alcohol consumption by an accused without consideration of (1) the quantity consumed, (2) the time span of consumption, (3) the accused's assertions of sobriety, and (4) the absence of evidence of discernible alcohol-related impairment.

■ The legislature certainly has the right to define the terms and phrases used by it when enacting statutes. *ITT Canteen Corp. v. Spradling*, 526 S.W.2d 11, 16 (Mo.banc 1975). Moreover, " ' "[t]he legislature's own construction of its language by means of definition of the terms employed should be followed in the interpretation of the statute to which it relates." ' " *State v. Rousseau*, 34 S.W.3d 254, 259 (Mo.App.2000) (citations omitted).

■ When, on the other hand, a phrase used in a statute is left undefined but its meaning is essential to interpretation of the statute, the overarching principle is that the intent of the General Assembly must prevail, and that intent is gleaned from the plain and ordinary meaning of the statute's language. *Wolff Shoe Company v. Dir. of Revenue*, 762 S.W.2d 29, 31 (Mo.banc 1988); *Estate of Dugger v. Dugger*, 110 S.W.3d 423, 428[6] (Mo.App.2003).

■ Another relevant rule of construction is that when the legislature enacts a statute referring to a term which it does not define and which has judicial or common law meaning attached to it, the legislature is presumed to have acted with knowledge of that meaning. *State v. Harris*, 156 S.W.3d 817, 823[11] (Mo.App.2005). Moreover, when a statute uses words or phrases having a definite and well-known meaning at common law, we presume that the terms are used in the sense in which they were understood at common law, and they will be so construed unless it clearly appears that it was not so intended. *State*

*v. Duggar*, 806 S.W.2d 407, 408 (Mo.banc 1991).

Although the phrase "intoxicated condition" was left undefined by the legislature in section 562.076, those are words that had a well-defined and well-understood meaning that we presume the legislature knew about when it used them in the statute. For instance, in Chapter 565 (which contains the assault statute that Defendant was convicted of violating), the legislature defined "intoxicated condition" as *"under the influence* of alcohol, a controlled substance or drug, or any combination thereof." § 565.002(4) (emphasis added). This definitional statute predated section 562.076. The words "under the influence" used in section 565.002(4) have been said to cover

> "not only all well-known and easily recognized conditions and degrees of intoxication, but any abnormal mental or physical condition which is the result of indulging in any degree of intoxicating liquors or drugs, and which tends to deprive one of the clearness of intellect and control of himself which he would otherwise possess."

BLACK'S LAW DICTIONARY, 1527 (6th ed.1990).

Other plain-meaning dictionary definitions of "intoxicate" include "to affect temporarily with diminished physical and mental control by means of alcoholic liquor, a drug, or other substance," RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY, 1000 (2nd ed.1999), and "to excite or stupefy by alcoholic drinks or a narcotic esp. to the point where physical and mental control is markedly diminished." MERRIAM-WEBSTER THIRD NEW INTERNATIONAL DICTIONARY, 1185 (1976).

Also, Missouri case law on the books since 1927 declares:

> "[T]he words 'intoxicated condition' are of common, everyday use, having a well-defined and well understood meaning.

Every one knows that the words refer to the impaired condition of thought and action and the loss of the normal control of one's faculties caused by imbibing vinous, malt, or spiritual liquors. The words are not technical but are in common use and well understood by the laity."

*State v. Reifsteck*, 317 Mo. 268, 295 S.W. 741, 742–43 (1927).

Based on the plain meaning of "intoxicated condition" as gleaned from dictionaries and on the definition of that term as used by both the legislature and courts before enactment of section 562.076, we find the legislature did not intend to equate the phrase "intoxicated condition" in section 562.076 to alcohol or drug consumption alone without any evidence of resulting impairment therefrom. We are persuaded that when the legislature via section 562.076 spoke of "[e]vidence that a person was in a voluntarily intoxicated condition," it meant to require, at a minimum, some evidence from which it could be reasonably inferred that an accused's alcohol consumption had impaired his condition of thought or action; or had caused the loss of the normal control of his faculties; or that he exhibited some abnormal mental or physical condition that was the result of indulging in intoxicating liquors or drugs or that tended to deprive him of the clearness of intellect and control of himself that he would otherwise possess.

Measured by that standard, it was error to give the MAI–CR3d 310.50 instruction here. This follows because evidence meeting this criteria was wholly absent from this record. The prosecutor implicitly admitted this when, in his final remarks to the jury, he asserted that Defendant "was aware of everything that was going on[;]" "[h]e knew what he was doing[;]" "[h]e told you he was in control[;]" "[h]e was in control when he ran out the back door[;]" and "[h]e was in control when he went to Houston." Because of the absence of evidence that Defendant was in an "intoxicated condition," it was error to give Instruction No. 13 patterned after MAI–CR3d 310.50. *Kehner*, 886 S.W.2d at 133–34; *James*, 869 S.W.2d at 278.[8]

■■ This does not end our inquiry, however, because an appellate court may not reverse for instructional error unless prejudice results therefrom. *State v. Hirt*, 16 S.W.3d 628, 632[7] (Mo.App.2000). Prejudice results when the instructions are misleading and confusing to the jury. *State v. Green*, 812 S.W.2d 779, 787[10] (Mo.App.1991). In the prejudice analysis, an appellate court must examine the language of the instruction and the facts of the case. *State v. Ward*, 745 S.W.2d 666, 670[6] (Mo.banc 1988).

The pertinent language of the instruction was at issue in *Kehner*, 886 S.W.2d 130.[9] There, the defendant claimed that he shot the victim in self-defense and evidence was introduced that the defendant had been drinking prior to the shooting. On the prejudicial nature of the instruction, the court held:

---

8. We recognize the *Kehner* and *James* cases were decided when Notes on Use for MAI–CR3d 310.50 required more evidence of intoxication than what we have found is required to support submission of the subject instruction. We note this to clarify that we cite *Kehner* and *James* as authority for saying it is error to submit an MAI–CR3d 310.50 instruction when there is not substantial evidence and reasonable inferences that can be drawn therefrom to support a finding of intoxicated condition. We have not used the *Kehner* and *James* definition or standard of "intoxicated condition" (as gleaned from the old Notes on Use) to reach our decision.

9. Although *Kehner* was decided after *Erwin* and before the changes to the Notes on Use, the prejudice analysis applied only to the second part of the instruction which has remained unchanged. Consequently, the prejudice discussion in *Kehner* is still good law.

"Appellant did not attempt to defend the charges against him by arguing that he was intoxicated. Rather, appellant attempted to defend the charges against him by claiming self-defense. Because appellant did not raise the issue of intoxication or impairment, submitting Instruction No. 10 [MAI–CR3d 310.50] was likely to have confused the jury or misled them to believe appellant admitted to some wrongdoing and was attempting to escape liability based on intoxication."

*Id.* at 134. The *Kehner* court's rationale was that the instruction implied that the defendant was in fact intoxicated and further implied that he admitted to doing something wrong, but should not be held responsible because of the intoxication.

The same reasoning applies here. By giving the instruction, the jury was led to believe two things: (1) that Defendant was attempting to escape liability based on intoxication, i.e., he implicitly admitted some wrongdoing, and (2) that Defendant was, in fact, intoxicated which would negatively affect his credibility, i.e., the key issue at trial. These two implications directly contradicted Defendant's claim of self-defense. When the court instructed the jury, it impliedly ratified these two implications. On the other hand, both the prosecutor and Defendant claimed otherwise. The jury could not help but be hopelessly confused and misled by the two contrary positions. As such, the jury instruction was prejudicial to Defendant. Point granted.

The convictions and sentences are reversed and the case is remanded for a new trial.

GARRISON and BARNEY, JJ., Concur.