STATE of Missouri, Plaintiff–
Respondent,

v.

David GARY, Defendant–Appellant.

David GARY, Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

Nos. 65495, 67444.

Missouri Court of Appeals,
Eastern District, Division Two.

Nov. 14, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 4, 1996.

Application to Transfer Denied
Feb. 20, 1996.

824

Deborah B. Wafer, District Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Beal, Asst. Atty. Gen., Jefferson City, for respondent.

DOWD, Judge.

Defendant appeals from the judgments of conviction, after a jury trial, for murder in the first degree, § 565.020.1, RSMo 1986, assault in the second degree, § 565.060, RSMo 1986, and two associated counts of armed criminal action, § 571.015, RSMo 1994. He was sentenced by the court to life imprisonment without possibility of probation or parole for the murder, ten years for the assault and five years each for the armed criminal actions, the terms to be served consecutively.[1] We affirm.

The evidence in the light most favorable to the verdict is as follows. On September 9, 1989, Defendant had been drinking beer. At approximately 2:30 a.m., Defendant drove to the St. Louis home of his estranged wife's boyfriend to speak to her about reuniting. Their relationship had been tempestuous. During the course of their marriage, he had assaulted her. When she left him in the early part of July 1989, he threatened to kill himself with a shotgun unless she came back. That episode ended when she convinced him not to kill himself. However, on August 19, 1989, he threatened to stab himself with a butcher knife if she would not return to him. She refused, and he plunged the knife into

his abdomen, damaging several vital organs. Emergency surgery was required.

In the early morning hours of September 9, 1989, Defendant's efforts to reconcile with his estranged wife concluded with his striking her in the mouth. Another person attempted to intervene, and Defendant struck him also. Defendant noticed that his estranged wife was bleeding from the mouth. He escorted her into his green Ford and proceeded to drive to Barnes Hospital. En route to the hospital, Defendant sped towards a pole and threatened to crash into it unless she said she loved him. She pleaded that he not do it for the sake of his stepdaughter (her daughter). Defendant did not carry out his threat.

Defendant's car came to a screeching halt near the emergency room entrance of Barnes Hospital. Defendant's estranged wife was wheeled into the hospital while hospital security guard Harry Williams entered with Defendant. Defendant attempted to talk to his estranged wife, but she refused him. Defendant implied to an attending nurse that he had hit her. Following this admission, he became very upset and distraught. Williams accompanied Defendant outside where Defendant explained that it was "all [Defendant's] fault." Williams tried to calm Defendant. Eventually, somewhat soothed, Defendant attempted to speak to his estranged wife for a second time. Again, she rebuffed him.

Once again, Williams accompanied the increasingly upset and agitated Defendant outside. Defendant explained that his estranged wife would not come back to him. He said "he had to pay for what he did" and that "he felt like taking his car and wrapping it around a tree." "He wanted to hurt himself."

His estranged wife eventually agreed to speak with him. Williams' attention was temporarily consumed by another matter, when he noticed Defendant hurrying out the hospital exit. Williams chased Defendant into the parking lot. Defendant had gotten into his car and was backing it up at a high

1. Defendant also appeals from the denial of his Rule 29.15 motion for post-conviction relief. However, he did not brief this appeal. His appeal from the order of the motion court is dismissed by reason of abandonment. *State v. Nelson*, 818 S.W.2d 285, 287 (Mo.App.1991).

rate of speed towards Williams. Williams believes Defendant applied the brakes to stop the vehicle. Williams leaned through the driver's side window, attempted to retrieve the car keys, and tried to calm Defendant down. Defendant lurched the car forward causing the vehicle to hit Williams in the side. Williams said "You're taking my arm off. Stop now; get out of the car." Defendant told Williams to let go or Defendant "was going to take [Williams] with him." Williams' calming efforts appeared to have some effect as Defendant took his hands from the steering wheel and leaned back on the seat. However, as he did so, Defendant peered into his rearview mirror and saw a police cruiser and approaching police officers. He again became upset. He exclaimed, "You called the f___ing police, motherf___er" and renewed his threat to take Williams with him if Williams did not let go. An approaching police officer instructed Williams to step away, which he did. Defendant sped out of the parking lot.

Defendant initially returned to his estranged wife's boyfriend's house, but subsequently drove to the nearby home of his grandfather-in-law to seek his comforting. No lights were on at this house, so Defendant continued to drive.

Officers Christopher Kornberger and Frederic Heagney of the City of St. Louis Police Department were in a marked police cruiser near the area Defendant had driven. They had been dispatched to the area to investigate a reported assault. They witnessed Defendant in a green Ford backing up at a high rate of speed through the Boyle and Manchester intersection and saw a man standing nearby point at the green Ford and announced, "That's the car." Officer Kornberger began following Defendant. After briefly observing Defendant, the officers activated their roof-top emergency lights. Defendant initially slowed and began pulling to the side of the street; however, he steered back into the traffic lane and began driving at a high rate of speed. Officers Kornberger and Heagney pursued.

Defendant drove east on Chouteau in excess of ninety miles per hour. Officer Heagney reported the progress of their chase on the police radio. Officer George Moehlenhoff of the City of St. Louis Police Department was cruising in his marked police car east of Defendant's location. He was monitoring the radio dispatches and was aware of the ongoing pursuit of Defendant. With his emergency lights activated, he steered his cruiser west onto Chouteau. Officer Moehlenhoff observed Defendant's green Ford approaching east on Chouteau at a high rate of speed. Officer Moehlenhoff as well as the pursuing Officers Kornberger and Heagney saw the Defendant's Ford cross over the center line and enter the westbound lane of traffic. Defendant's new course placed him in an intercept path with Officer Moehlenhoff's cruiser travelling the opposite way. To avoid colliding, Officer Moehlenhoff abruptly steered his cruiser onto the sidewalk abutting the westbound lane of traffic. Defendant's car passed within a couple of feet of Officer Moehlenhoff's cruiser.

After passing Officer Moehlenhoff, Defendant turned off his headlights, moved back into the eastbound lane, and continued at a speed in excess of ninety miles per hour. When he reached the intersection of Chouteau and Seventh Street, he attempted a high speed, right-hand turn south onto Seventh Street. His car failed to negotiate the turn and skidded into the curb at the southeast corner of the intersection. His car bounced back into the street and stalled. He managed to restart the car and resumed his previous rate of speed but now proceeding south on Seventh Street.

Seventh Street is a multi-lane road with three lanes of traffic and one parking lane for each of the north and southbound directions. Near the Soulard Farmer's Market, a semi-truck and trailer had stopped at a stop sign in the middle, southbound traffic lane. Defendant's Ford sped south towards the rear of the trailer. Officer Heagney believed it was too late for the Ford to avoid crashing into the trailer when it abruptly steered right and passed the semi-truck and trailer. Officers Heagney and Kornberger passed the truck on the left.

From the point where Defendant's Ford passed the truck, Seventh Street has a gentle, downhill roll. Approximately 1,430 feet

down the roll was the intersection of Seventh Street and Russell Street. Officer Michael McNew of the City of St. Louis Police Department had stopped his marked police cruiser in this intersection facing east on Russell Street and in the parking lane and slightly in the first traffic lane of southbound Seventh Street. The cruiser's rooftop emergency lights were turned on. Officers Heagney and Kornberger, the driver of the passed truck, and the driver of a northbound vehicle all saw Officer McNew's cruiser in the intersection. Officers Heagney and Kornberger, who were following Defendant and shared approximately the same vantage point as Defendant, could continuously see Officer McNew inside the cruiser from roughly the moment they passed the truck. At the speed Defendant was travelling, he had approximately ten seconds between the moment he could first view Officer McNew's cruiser and the moment he would reach the cruiser. Each witness at the scene saw Defendant's speeding Ford veer from its course down the center of Seventh Street and head into the parking lane of Seventh Street right at Officer McNew's cruiser. Defendant's Ford slammed into the driver's side of McNew's cruiser. No witness observed the Ford decelerate or its brake lights turn on. There was no physical evidence to indicate Defendant applied the Ford's brakes.

An accident reconstructionist estimated that Defendant's Ford was traveling one-hundred-two miles per hour when it impacted Officer McNew's cruiser. The cruiser virtually "blew up" from the force of the impact. The two vehicles caught fire and skidded south on Seventh Street; the wrecked chassis of the cruiser gouged the pavement of the street. The driver's side of the cruiser was smashed so far into the interior that it nearly touched the passenger side. The flaming wreckage of the cars finally came to rest approximately 180 feet from the point of the collision.

Officer McNew was seated in the driver's seat of the cruiser. The devastating blow of Defendant's Ford caused damage to virtually every part of Officer McNew's body. He received numerous injuries sufficient to cause his death. In the short time it took the pursuing officers to get to the wreckage and retrieve Officer McNew, it was apparent that he had died from his injuries.

An inventory of the Ford's contents following the accident revealed Defendant possessed several beer cans. Some of the cans were full and some were empty. Furthermore, a bottle of hard liquor was found.

Defendant defended under the theories of diminished capacity and lack of premeditation. Defendant testified in his own defense. He stated that he was extremely upset and wanted to kill himself. He wanted to run his Ford into the floodwall along the Mississippi River. He said he ran Officer Moehlenhoff off the road to prevent the officer from stopping him from carrying out his suicide attempt; he did not intend to injure or harm Officer Moehlenhoff. He testified he turned onto Seventh Street from Chouteau because he saw an oncoming vehicle and feared he might endanger the occupants of the vehicle. He said he had thought about crashing into the trailer on Seventh Street but was concerned for the safety of the truck's driver. He claimed that as he went around the semi-truck and trailer, his head was down and he was crying. When he looked up, he saw Officer McNew's police cruiser. He saw no one in the cruiser and believed it to be empty. He said he had seen police car barricades depicted many times in entertainment movies, and the police in these depictions vacated their vehicles. He asserts he steered his Ford into the side of the police cruiser in an attempt to kill himself, and he had no intent to harm any one else. To bolster this claim, he presented a witness who was present at the scene of the accident shortly after it had occurred. The witness said he heard a police officer tell Defendant, "You've just killed a police officer." According to this witness, Defendant responded, "I can't believe it."

To support his theory of diminished capacity, Defendant offered the expert testimony of Dr. Bruce Harry, a psychiatrist. Dr. Harry diagnosed Defendant as suffering from major depression and the less severe depressive condition of dysthymia at the time of Officer McNew's death. Dr. Harry said his diagnosis was based on prior medical and psycho-

logical records, police reports, accounts from persons with knowledge of Defendant's behavior, and statements made by Defendant during Dr. Harry's examination of him. Dr. Harry's opinion was that the collision "was the result of major depression."

The state called clinical psychologist Michael Armour to rebut Dr. Harry's testimony. Armour agreed with Dr. Harry's diagnosis Defendant was suffering major depression at the time of Officer McNew's death. However, he disagreed with Dr. Harry in his conclusion that the collision was the result of the major depression.

The jury found Defendant guilty of first degree murder, second degree assault, and two counts of armed criminal action. Defendant was acquitted of a third degree assault charge.

█ In his first point, Defendant contends "the trial court erred in overruling defense objections and permitting the State to adduce evidence relating to [Defendant's] consumption of alcohol and his possession of alcoholic beverages and containers." He argues this evidence was not relevant to any issue in this case and that its admission prejudiced him. Defendant cites *State v. Erwin*, 848 S.W.2d 476 (Mo. banc 1993), to support his argument that his consumption and possession of alcohol was not relevant. In *Erwin*, the supreme court reiterated the Missouri Rule that "merely treats a sober person and a voluntarily intoxicated person as equally responsible for conduct." *Id.* at 482. This rule prohibits a jury from considering voluntary intoxication on the issue of the Defendant's mental state. *Id.*

The state's remedy when a defendant attempts to introduce evidence of intoxication on the issue of state of mind is to

object to the relevancy of the evidence.... [However,] [t]here may be situations where evidence of intoxication is relevant to some issue other than the defendant's state of mind. In those rare situations the state's remedy may be to request an instruction that the evidence of intoxication is admitted only for a limited purpose....

*Id.* Clearly, the prohibition against evidence of voluntary intoxication contained in *Erwin* extends only to that evidence offered to negate a mental element of the offense—if the evidence is otherwise relevant, then it may properly be admitted.[2]

█ In order for evidence to be relevant, it must logically tend to support or establish a fact or issue between the parties. *State v. Hernandez*, 815 S.W.2d 67, 70 (Mo. App.1991). Among the defenses offered by Defendant was "diminished responsibility" or "partial responsibility" doctrine. This doctrine permits the Defendant to introduce evidence of a mental disease or defect to prove the absence of a particular mental element of the crime. *See, e.g., State v. Anderson*, 515 S.W.2d 534, 537 (Mo. banc 1974); § 552.015.2(8), RSMo 1994. Unlike the doctrine of not guilty by reason of insanity which provides a defendant is not criminally responsible for his conduct "if, at the time of such conduct, as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct," § 552.030.1, RSMo 1994, under the diminished capacity doctrine, the defendant accepts criminal responsibility for his conduct but seeks conviction of a lesser degree of the crime because the mental disease or defect prevented the defendant from forming the mental element of the higher

---

2. Defendant has also asserted the admission of alcohol possession and consumption evidence violated § 562.076.3, RSMo 1994:

Evidence that a person was in a voluntary intoxicated or drugged condition may be admissible when otherwise relevant on issues of conduct but in no event shall it be admissible for the purpose of negating a mental state which is an element of the offense. In a trial by jury, the jury shall be so instructed when evidence that a person was in a voluntarily intoxicated or drugged condition has been received into evidence.

However, this subsection was not enacted until 1993, well after the acts constituting the offense occurred. We need not resolve whether application of this subsection in the instant case would violate defendant's constitutional ex post facto rights. For the purposes of the issues in this appeal, Section 562.076.3 essentially mirrors the common law rules contained in *Erwin*. Our resolution under *Erwin* coincides with any possible resolution under the statute should it have been enforceable against defendant.

degree of the crime. *See, Anderson,* 515 S.W.2d at 537.

■ "A defense of diminished capacity because the accused is incapable of forming the mental element necessary to commit a crime is necessarily based on evidence of a mental disease or defect as defined in § 552.010." *Erwin,* 848 S.W.2d at 480. Mental disease or defect is defined in § 552.010, RSMo 1994, as including "congenital and traumatic mental conditions as well as disease." Alcoholism without a psychosis is not a mental disease or defect. *Id.* Voluntary intoxication alone is not a mental disease or defect. The doctrine of diminished capacity is not available where the lack of capacity to form the mental element was the result of voluntary intoxication. *See, State v. White,* 847 S.W.2d 929, 933–34 (Mo.App.E.D. 1993); *Erwin,* 848 S.W.2d at 482.

Defendant offered the testimony of Dr. Harry to support his theory of diminished capacity. Dr. Harry testified Defendant suffered severe mental illness which rendered him incapable of forming the mental state required in first degree murder. This testimony was supported by the evidence of Defendant's conduct on that evening, evidence of his erratic emotional behavior at the hospital, evidence of his dangerous driving, and evidence from Defendant's own testimony that he was not thinking clearly or rationally.

Defendant injected the issue of his mental capacity. Therefore, evidence of Defendant's mental capacity or evidence offered to undermine Defendant's evidence of mental capacity was relevant.

On the general principle of relevancy ..., any piece of conduct offered as indicating insanity may be *explained away* as equally or more consistent with some other hypothesis. That which appears to be an irrational act or utterance may, in the light of certain facts, be rational, or may be the result of some other abnormal mental condition than insanity (such as fever or intoxication). These *explanatory facts* are thus always admissible, providing only that they have in some degree an explanatory significance. This much is indisputable, and is

merely a simple application of a general principle. (Emphasis in original.)

2 Wigmore, Evidence § 228(6) (Chadbourn rev. 1979).

■ During the trial, the prosecutor explained his purpose for offering evidence of alcohol was to undermine the Defendant's diminished capacity theory: "My burden is not only of proof beyond a reasonable doubt on the elements but persuasion that the defense offered is ludicrous and is of no merit...." The consumption and possession of alcohol was relevant to explain Defendant's conduct and was admissible as explanatory facts to counter Defendant's theory of diminished capacity. While a jury is prohibited from considering voluntary intoxication to negate a mental element of the crime charged, evidence of voluntary intoxication may be admitted to explain conduct purported to demonstrate a mental disease or defect. Point denied.

■ In his second point, Defendant asserts the trial court erred in submitting Instruction No. 17, based on MAI–CR3d 310.50, to the jury. MAI–CR3d 310.50 which is the instruction explaining voluntary intoxication does not relieve an accused of criminal responsibility. Rule 28.02 requires both "error" in submitting the instruction and prejudice to the defendant before an appellate court may reverse the trial court's decision based on an error in the jury instruction. *State v. Green,* 812 S.W.2d 779, 786 (Mo.App. 1991).

■ Defendant relies on *State v. Kehner,* 886 S.W.2d 130 (Mo.App.E.D.1994). In *Kehner,* we held it violated the Notes On Use to submit an instruction patterned on MAI–CR3d 310.50 where the evidence of intoxication only consisted of the defendant's consumption, possession, and odor of alcohol. *Id.* at 133–34 (relying on *State v. James,* 869 S.W.2d 276 (Mo.App.E.D.1994)). The Notes On Use read: "Even though there is evidence of consumption of alcohol or drugs, if there is no evidence from which such impairment could be inferred, this instruction may not be given over the objection of the Defen-

dant." [3]

The evidence here fully supported giving the instruction. The evidence showed not only that Defendant had been drinking on that evening and that he possessed empty and full beer cans and a bottle of hard alcohol in his car, the evidence was also rampant with evidence of Defendant's erratic conduct. The evidence also showed Defendant drove his vehicle in a reckless manner and that he failed to successfully negotiate a right-hand turn. Additionally, by Defendant's own testimony, he was not thinking clearly and had trouble distinguishing reality. We hold this to be sufficient evidence to infer Defendant's impairment from alcohol. *See State v. Robinson,* 825 S.W.2d 877, 882 (Mo.App.1992).

In his third point, Defendant asserts he was denied a fair trial and due process by the submission of Instruction No. 17, the voluntary intoxication instruction. He claims that the instruction implicitly "relieves the state of its burden of proving the element of intent ... in that it creates a presumption that an intoxicated person is guilty by stating that an intoxicated person is responsible."

■ Defendant does not challenge Instruction No. 17 complied with the pattern instruction, and as we determined above, its submission was in compliance with the pattern instruction's Notes On Use. The Court of Appeals lacks the authority to declare an instruction which complies with pattern instructions approved by the Missouri Supreme Court erroneous. *State v. Bell,* 906 S.W.2d 737, 739–40 (Mo.App.E.D.1995). Point denied.

In his fourth point, Defendant asserts:

THE TRIAL COURT ERRED IN OVERRULING DEFENSE OBJECTIONS TO THE PROSECUTOR'S MISLEADING QUESTIONS, EVIDENCE, COMMENTS AND STATEMENTS WHICH DELIBERATELY IMPLIED TO THE JURY THAT [DEFENDANT] WAS TRYING TO EXCUSE HIS BEHAVIOR AND CLAIM THAT HE WAS NOT RESPONSIBLE AND NOT GUILTY BY REASON OF MENTAL ILLNESS OR ALCOHOLISM.

We have carefully reviewed the record and the excerpts Defendant contends were misleading. We do not find those statements to be intentional misrepresentations nor did they present an undue risk of misleading the jury. As stated above, the state was properly allowed to explain Defendant's conduct was the result of alcoholic intoxication rather than the result of a mental disease or defect. Similarly, the state was allowed to inform the jury of the law that voluntary intoxication does not relieve Defendant of criminal responsibility. The prosecutor's statements were essentially consistent with these purposes. Furthermore, Defendant had the opportunity to, and the jury instructions provided, clarification of any possible confusion inherent in the dynamics between diminished capacity, voluntary intoxication, and not guilty by reason of insanity. The trial court was in the best position to assess the meaning and effect of these statements on the jury. Defendant has not persuaded us to disturb the court's determination. Point denied.

In his fifth point, Defendant asserts, "The trial court erred in sustaining the State's motion in limine and prohibiting the defense expert witness, Dr. Bruce Harry, from testifying about statements that [Defendant] had made concerning the offense to Dr. Harry, to the police and to other persons." Defendant's brief contains a summary of the statements (entered into the record during Dr. Harry's offer of proof) he argues should have been narrated by Dr. Harry:

After he left the hospital and saw the police lights, "he just snapped". "He thought that if he pulled over, he was going to jail". "He said that he was not running in anger or hatred, he just wanted to be left alone to do it to himself". "That is, to commit suicide".

[Defendant] stated that if he wanted to kill anyone or himself, he said, "I could have run into cars I passed up". "I didn't even have my lights on". [Defendant] told

---

**3.** The Notes On Use for MAI–CR3d 310.50 were twice revised (effective 10–1–94 and 10–1–95) eliminating the requirement of evidence to infer impairment. However, this trial took place while the above quoted Notes On Use were still in effect.

Dr. Harry that he "was not paying attention, he was crying, he had a headache, his abdomen was burning from the recently healing wound where he had stabbed himself, and that he was shaking real bad". He thought the police car parked in the intersection at Seventh Street and Russell was a roadblock and that "the police get out of their cars at roadblocks". He thought that if there was anyone in the car, "he'll move". [Defendant] told Dr. Harry, "I didn't know there was a human being in there". "I should have been killed like he was".

Defendant claims preventing Dr. Harry from testifying as to these statements made by Defendant violated his "constitutional rights to present a defense and to not be compelled to testify...."

In Missouri, an expert is permitted to rely on hearsay evidence to support an opinion, even though the hearsay evidence is not independently admissible, if that evidence is of a type reasonably relied upon by other experts in that field. *State v. Rowe*, 838 S.W.2d 103, 110 (Mo.App.E.D.1992). Defendant notes that in our case of *State v. Barnes*, 740 S.W.2d 340 (Mo.App.1987) we found no error in the trial court permitting a state psychiatric expert to narrate out-of-court statements of the defendant upon which the expert based his opinion. The purpose of its admission was to provide a foundation for the expert's diagnosis the defendant suffered from no mental disease or defect but was malingering. *Id.* at 343. The out-of-court statements in *Barnes* were not offered for the truth of the statements' assertions but rather the effects of the statements on the expert's opinion.

A physician testifying as to a patient's health may be asked, like any other witness, for the *reasons for his conclusions*—

either on direct examination, to show his opinion well founded ..., or on cross-examination, to show it ill founded ...; and incidentally the fact that it is in part or entirely founded on the statements of the patient or of others may thus be brought out. Here, of course, the patient's statement has no hearsay quality; without regard to its correctness or incorrectness, it enters merely as an observed fact forming part of the physician's data. It is possible to bring it forward in a testimonial shape; nevertheless, it is also possible, up to a certain point, to treat it merely as a fact affecting the weight of the physician's opinion.

6 Wigmore, Evidence § 1720(1) (Chadbourn rev. 1976). In *Barnes*, the jury was instructed to consider the statements only on the issue of the defendant's mental condition, *Barnes*, 740 S.W.2d at 343, not for the truth of the statements' assertions. Thus, *Barnes* does not support Defendant's argument that the trial court's prohibiting Dr. Harry from narrating Defendant's out-of-court statements coerced Defendant to testify. Even if admitted, those statements could have only been considered on the issue of the credibility of Dr. Harry's opinion concerning Defendant's mental state. The statements were not substantive evidence for the truth of the statements' assertions.[4]

As to Defendant's claim that the court's ruling disallowed relevant and material testimony of a defense witness essentially depriving him of his right to call witnesses in his behalf, we find no error. Initially, we note that Dr. Harry was permitted to testify as to the basis of his diagnosis. He testified his diagnosis was based on several police reports relevant to the incident, transcripts of police broadcast tapes and 911 records,

4. An *exception* to the hearsay rule does exist concerning out-of-court statements made to treating health providers. "Statements made in connection with a mental or physical examination are said to be admissible, even though they constitute hearsay, provided such statements constitute an essential element of the doctor's diagnosis and furnish a basis for treatment." *State v. Lachterman*, 812 S.W.2d 759, 770 (Mo.App.1991). Such statements may be used for the truth of the statements' assertion because of the

inherent reliability that such statements will not be misrepresentations due to the speaker's self-interest to tell the truth in seeking a cure.

Defendant makes no assertion that this hearsay exception is applicable, nor does it appear applicable. Dr. Harry's examination of Defendant was not in preparation of treatment. Rather, it was made only to render a diagnosis with the intent that the diagnosis be used as a defense to the crimes charged. These circumstances lack the inherent reliability required by the exception.

statements by Defendant's estranged wife, the deposition of several witnesses, transcripts of prior hearings, and medical records from Malcolm Bliss Mental Health Center, St. Louis University Medical Center, St. Louis Regional Medical Center, and the St. Louis City Jail as well as five personal interviews of Defendant. Thus, the jury was apprised of the extensive basis of Dr. Harry's diagnosis for determining the credibility of the diagnosis. Although Dr. Harry said Defendant's statements were important to his diagnosis, he did not indicate how informing the jury of the contents of the statements would aid the jury in assessing the credibility of the diagnosis. *Compare, Barnes,* 740 S.W.2d at 343 (expert explained a person suffering the mental disease asserted by the defendant would be unable to coherently describe the details of the events occurring while suffering from the mental disease. Expert was allowed to recite the defendant's statements to show his lucidity and detailed description of the events).

Furthermore, the credibility of Dr. Harry's *diagnosis* (which the omitted statements were intended to make more credible) was not an issue of great dispute. The state's psychiatric expert agreed with Dr. Harry's primary diagnosis that Defendant was suffering major depression at the time of Officer McNew's death. The dispute centered on the effect of major depression on Defendant's mental capacity to form the mental elements of the crime charged. Neither Dr. Harry's offer of proof nor Defendant's brief indicates how the out-of-court statements of Defendant would bolster or make more credible Dr. Harry's opinion as to the effects of major depression on a sufferer.

Moreover, the transcript shows and Defendant's arguments on appeal bear out, Defendant's dominant purpose for seeking admission of these statements was not to bolster Dr. Harry's credibility but to allow the jury to use the hearsay quality of the statements so that Defendant would not have to testify. It was not error for the court to perceive Defendant's dominant purpose and exclude the evidence as hearsay:

> No doubt the principle must not be wrested from its proper purpose. Where under the pretext of [*offering the narration as a reason for conclusion*], not merely the fact of a patient's statement, but the details of it, are so offered that its use for that purpose is a mere pretense, and its real use and predominating effect would be that of hearsay testimony of the patient, it should be excluded.

6 Wigmore, Evidence § 1720(3) (Chadbourn rev. 1976). Point denied.

In Defendant's final point, he asserts there was insufficient evidence to support the first degree murder charge because the evidence "did not support a finding that [Defendant] knew a police officer was in the car that he hit...."[5]

Contrary to Defendant's argument, there was sufficient evidence to find Defendant knew the rammed police car was occupied. Both Officers Kornberger and Heagney, who were in pursuit of Defendant's Ford, testified that they could see Officer McNew in his police cruiser. A reasonable and proper inference of this testimony was that Defendant also saw Officer McNew. Furthermore, Officer McNew's cruiser was in the intersection with its emergency lights activated. There were numerous witnesses at this scene and no witness, including Defendant, testified seeing anyone on foot near the intersection consistent with Defendant's alleged assumption the cruiser's occupant(s) had vacated the vehicle. Defendant had approximately ten seconds to assess the occupancy of the cruiser. A reasonable inference from the evidence is that, even if Defendant did not *see* Officer McNew, he steered his Ford into the cruiser believing it was occupied. This inference is bolstered by Defendant's earlier declarations of hostility towards police officers in the hospital parking lot and his apparent attempt to hit Officer

---

5. Defendant cites a court statement to further assert the "court agreed that [Defendant] could not have seen anyone in the car." The trial court's belief concerning the sufficiency of the evidence is more accurately reflected by its denial of Defendant's sufficiency arguments in his motions for judgment of acquittal at the close of the state's case.

Moehlenhoff's moving (and presumably occupied) cruiser on Chouteau. Point denied.

We affirm.

CRAHAN, P.J., and CRANDALL, J., concur.